IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

TAKEDA PHARMACEUTICALS U.S.A.,
INC., et al.,

                    Plaintiffs,

      v.

SPIRIDON SPIREAS,

                    Defendant.

CIVIL ACTION
NO. 17-452

## TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................ 4

II.    BACKGROUND .................................................................................................. 6

    A.    Spireas And Bolton Develop And Patent Their Liquisolid Technology And Form Hygrosol Pharmaceutical Corporation To Market The Technology ............................... 6

    B.    Mutual PA And United Enter Into An Agreement ("1998 Agreement") With Spireas, Bolton, And Hygrosol To License The Liquisolid Technology To Develop Generic Drug Products................................................................................................... 7

    C.    Spireas and Bolton Receive Four (4) Liquisolid Technology Patents ........................... 10

    D.    Spireas Begins Working for Mutual PA, And Mutual PA And United License The Liquisolid Technology from Hygrosol to Develop Felodipine and Propafenone ...........11

    E.    Mutual PA And United Remit Royalty Payments To Hygrosol For Felodipine And Propafenone Drugs Pursuant To The 1998 Agreement.................................................. 13

    F.    In 2011, Mutual PA And United Sue Spireas, Bolton, And Hygrosol In State Court .... 16

    G.    Takeda Pharmaceuticals Acquires Mutual PA And United In 2012, And Sells The Generic Drug Business Of Mutual PA And United To Sun Pharmaceutical in 2013 .... 17

    H.    In 2013, The Internal Revenue Service ("IRS") Challenges Spireas' Treatment Of The Hygrosol Royalty Payments ................................................................................... 18

    I.    Ensuing Procedural History Of This Case .................................................................... 19

III.   STANDARD OF REVIEW ............................................................................... 24

IV.   ANALYSIS ......................................................................................................... 25

A.   Mutual Delaware Has Standing To Sue Under The 1998 Agreement ........................... 26

B.   United Has Standing To Sue Under The 1998 Agreement ............................................. 27

C.   Genuine Disputes Of Material Fact Exist As To Whether United Paid Royalties
     To Hygrosol Under The 1998 Agreement....................................................................... 31

     1.   Enough Evidence Has Been Offered To Create Genuine Disputes Of
          Material Fact As To Whether United Made Royalty Payments Under
          The 1998 Agreement From 2002 To 2013 ............................................................ 32

     2.   Genuine Disputes Of Material Fact Exist As To Whether Mutual Delaware,
          A Successor To United, Made Royalty Payments Under The 1998 Agreement ... 35

D.   Genuine Disputes Of Material Fact Exist As To Whether Spireas Received Royalty
     Payments From Hygrosol For Felodipine And Propafenone Under
     The 1998 Agreement....................................................................................................... 36

     1.   Hygrosol Received Royalty Payments Under The 1998 Agreement And
          Then Distributed The Royalty Payments To Spireas And Bolton ........................ 38

     2.   Whether The Royalty Payment Passed Through Hygrosol Before Reaching
          Spireas Has No Effect On Mutual Delaware's Claim For Money Had And
          Received................................................................................................................. 40

     3.   On Its Claim for Breach of Contract, Mutual Delaware Is Entitled To Seek
          Royalty Payments Made By United To Hygrosol Under The 1998 Agreement ... 41

E.   The October 2018 Settlement Agreement Between Takeda, Spireas,
     And Hygrosol Does Not Preclude Mutual Delaware's Claims ...................................... 45

F.   Genuine Disputes Of Material Fact Exist As To Whether Mutual Delaware And
     United Made Royalty Payments Under The 1998 Agreement Voluntarily As
     A Result Of An Unprovoked Mistake Of Law................................................................ 48

G.   Spireas Is Not Entitled To Summary Judgment Based On Claim Preclusion................ 49

H.   Genuine Disputes Of Material Fact Preclude Judgment As A Matter Of Law On
     Spireas' "Companion" Motion For Summary Judgment On Mutual Delaware's    Claim
     For Money Had And Received Based On False Pretenses .............................................. 52

     1.   Mutual Delaware Is Not Required To Prove Fraud In Order To Maintain
          Its Claim For Money Had And Received............................................................... 53

2.  Genuine Disputes Of Material Fact Have Been Shown As To Whether Spireas Made Material Misrepresentations to Mutual PA And/Or United In Connection With The 1998 Agreement................................................................ 54

3.  Genuine Disputes Of Material Fact Have Been Shown As To Whether Mutual PA And/Or United Justifiably Relied On Spireas' Representations That They Were Selling Drugs That Contained The Patented Technology .......... 56

V.  CONCLUSION ................................................................................................................ 59

**OPINION**

**Slomsky, J.**                                    **September 3, 2019**

## I.    INTRODUCTION

On June 12, 1998, Defendant Spiridon Spireas ("Spireas"), his business partner, Dr. Sanford Bolton ("Bolton"),[1] and the company they formed together, Hygrosol Pharmaceutical Corp. ("Hygrosol"), executed a licensing agreement (the "1998 Agreement") with Mutual Pharmaceutical Company, Inc., a Pennsylvania corporation ("Mutual PA"), and its sister corporation, United Research Laboratories, Inc. ("United" or "URL"). Under the 1998 Agreement, Spireas and Bolton, through Hygrosol, granted Mutual PA and United the exclusive right to license their patent-pending "liquisolid technology" to use in formulating and developing generic drug products. Liquisolid technology is a process through which non-soluble drugs can be dissolved and converted into powder or pill form.

In March of 2000, Mutual PA and United licensed Spireas' and Bolton's now-patented liquisolid technology to develop generic propafenone and felodipine drug products, the active ingredients in the drugs Rythmol and Plendil, which are used respectively to treat irregular heart rates and high blood pressure. Under the terms of the 1998 Agreement, Spireas successfully developed formulations for felodipine and propafenone drug products for Mutual PA and United, after which Mutual PA and United began manufacturing and selling the drugs. In exchange for granting Mutual PA and United the right to their liquisolid technology, Spireas and Bolton received hundreds of millions of dollars from Mutual PA and United as royalties on the felodipine and propafenone products.

---

[1]    Dr. Bolton is not a party to this action. In 2011, Dr. Bolton passed away and his estate now holds "any rights and bears any obligations imposed" on him under the 1998 Agreement. (Doc. No. 64-1 at 5.)

In 2017, Takeda Pharmaceuticals U.S.A., Inc. ("Takeda"), the successor-in-interest to Mutual PA, uncovered testimony that Spireas had given in a tax court proceeding unrelated to this case. During those proceedings, Spireas testified that the formulations he made for propafenone and felodipine under the 1998 Agreement did not use his and Bolton's patented liquisolid technology. Consequently, Takeda filed this case, alleging that Spireas had breached the 1998 Agreement by misrepresenting the formulations of felodipine and propafenone. Takeda sought to recoup the $150 million in royalties that were paid to Spireas under the 1998 Agreement.

At the motion to dismiss stage of these proceedings, based on Spireas' argument that United was a necessary and indispensable party to this case, the Court ordered that Takeda join Mutual Pharmaceutical Company, Inc. ("Mutual Delaware"), the successor-in-interest to United, as a Plaintiff in this case. Takeda joined Mutual Delaware as a Plaintiff and, together, the parties filed an Amended Complaint against Spireas, alleging a claim for breach of contract (Count I), and claim for money had and received (Count II). In October of 2018, Takeda resolved its claims against Spireas in a settlement and was voluntarily dismissed from the case, leaving Mutual Delaware as the only remaining Plaintiff.

On February 28, 2019, Spireas filed a Motion for Summary Judgment challenging Mutual Delaware's claims for breach of contract and money had and received (Doc. No. 60), as well as a second Motion for Summary Judgment specifically on Mutual Delaware's claim for money had and received (Doc. No. 61). In the second Motion, Spireas argues for summary judgment on this claim to the extent that Mutual Delaware premises the claim on allegations of Spireas' fraudulent conduct. (Doc. No. 61.) These Motions are ripe for a decision. For the reasons discussed below, the Motions will be denied.

## II. BACKGROUND

### A. Spireas And Bolton Develop And Patent Their Liquisolid Technology And Form Hygrosol Pharmaceutical Corporation To Market The Technology

While a Ph.D. student at St. John's University, Spiridon Spireas met Sanford Bolton, who became his doctoral advisor. (Appendix ("App.") 297, 1126.)[2] Together, Spireas and Bolton developed their own "liquisolid technology," a process through which insoluble drugs are dissolved in non-volatile solvents and then converted into powder or pill form. (App. 1133-1134.) Subsequently, Spireas and Bolton sought to protect their liquisolid technology in a patent, and they submitted patent application No. 08/658,514 to the U.S. Patent and Trademark Office ("PTO") on June 10, 1996. (App. 54-57.)

On January 2, 1997, while the patent application was still pending, Spireas and Bolton formed Hygrosol Pharmaceutical Corporation ("Hygrosol"). This company was formed to be a vehicle for "explor[ing] commercial interest in their liquisolid inventions." (Doc. No. 64-1 at 8-9; App. 49, 53.) Hygrosol was organized as a Delaware closely-held corporation, meaning that Spireas and Bolton were Hygrosol's only two shareholders and officers. (App. 46, 53.) Hygrosol was also formed as an S-corporation, which meant that for tax purposes, it did not recognize income at the corporate level, but rather passed any income due through to Spireas and Bolton, who reported the income on their personal tax returns. (App. 47.)

After forming Hygrosol and while the first patent application for their liquisolid technology was still pending, Spireas and Bolton submitted a second liquisolid patent application (Application

---

[2] The Appendix ("App.") and Confidential Appendix ("Conf. App.") citations as used in this Opinion refer to the original Appendix and Confidential Appendix, and the supplements that have been submitted by the parties in connection with their summary judgment briefing. (App., Doc. Nos. 60-2, 60-3, 64-4, 64-5, 64-6, 64-7, 69-1; Conf. App., Doc. Nos. 62, 62-1, 66, 70, 77-2, 78.) Because the Appendix and Confidential Appendix have been submitted multiple times on the docket, for ease of reference, the Court will refer to the App. or Conf. App. citation as opposed to the specific docket entry number.

No. 08/937,240) to the U.S. PTO on October 1, 1997.  (Doc. No. 64-2 at 9; App. 58.)  The second

patent application was a "division" of the first application, intended to cover Spireas' and Bolton's

"process claims" for the liquisolid technology as opposed to the first application which covered

their "product claims."  (App. 1134.)

### B.  Mutual PA And United Enter Into An Agreement ("1998 Agreement") With Spireas, Bolton, And Hygrosol To License The Liquisolid Technology To Develop Generic Drug Products

In the late 1990s, around the same time Spireas and Bolton were developing and patenting

the liquisolid technology, Spireas formed his own pharmaceutical consulting company,

SigmaPharm, Inc.  (App. 1127.)  Through SigmaPharm, Inc., Spireas began consulting with

Mutual Pharmaceutical Company, Inc., a Pennsylvania corporation ("Mutual PA"), and became

friendly with Richard H. Roberts, M.D., Ph.D. ("Roberts"), the President and Chief Executive

Officer of both Mutual PA and Mutual PA's sister corporation, United Research Laboratories, Inc.

("United").[3]  (App. 53, 1127.)  At the time, Mutual PA was in the process of trying to develop

several generic drug products.

In 1998, Spireas and Roberts began negotiating an agreement with Mutual PA and United

to allow them to license Spireas' and Bolton's liquisolid technology for the development of new

generic drugs.  On June 1, 1998, in anticipation of entering into an agreement with Mutual PA and

United, Spireas and Bolton held an annual meeting for Hygrosol.  (App. 53.)  At the meeting,

Spireas and Bolton agreed to assign Hygrosol their liquisolid patents once the patents were

approved so that Hygrosol, as opposed to Spireas and Bolton individually, could license the

liquisolid technology to Mutual PA and United.  (Id.)  Spireas and Bolton recorded their assignment

---

[3]   As discussed in more detail infra, Mutual PA and United were "sister" corporations because they were both subsidiaries of the corporation URL Pharma, Inc.

agreement in the minutes of Hygrosol's annual meeting, but otherwise took no steps to legally complete the assignment process.

On June 12, 1998, Spireas, Bolton, and Hygrosol executed the licensing agreement (the "1998 Agreement") with Mutual PA and United, giving these two entities exclusive rights to develop drug products using the liquisolid technology. (Doc. No. 64-1 at 4; App. 1-16.) The rights outlined in the 1998 Agreement were as follows:

> 2.1 Spireas, Bolton and Hygrosol grant to Mutual and United:
>
>> 2.1.1 The exclusive rights to utilize the Technology to develop products that Mutual, United and Hygrosol, acting in good faith, will unanimously select. Hygrosol, Spireas, and Bolton shall supervise the development of said Products.
>>
>> 2.1.2 The exclusive right to produce, market, sell, promote and distribute (collectively, to "Produce and Sell") in the markets of the United States of America said Products containing the Technology. Depending on the marketing strategy used for each Product and agreed by both parties, Hygrosol may extend to Mutual and United the exclusive right to Produce and Sell a certain Product on a world-wide basis.

(App. 2.) These rights were triggered once Mutual PA, United, and Hygrosol collectively agreed on a product to develop using the "Technology":

> The period during which Mutual and United shall have the exclusive right to Produce and Sell the Products identified by the parties as described herein commences as soon as: (a) said Product is identified by either party and agreed upon in writing by Hygrosol, Mutual and United; and (b) Mutual and United pay Spireas a sum of $10,000 as an initial development fee to conduct preliminary feasibility studies related to the Product's development (as further described in Section 5.1 below).

(App. 2 at § 2.2.)

"Technology" was defined as the technology "which is the subject of the Patent." (App. 1.) "Patent" was defined in the Agreement as the technology in Spireas' and Bolton's first patent application No. 08/658,514. (Id.) While application No. 08/658,514 was still pending at the time

the 1998 Agreement was executed, Spireas and Bolton had "obtained notice of allowance of their patent claims" made in the application such that approval of the patent was imminent. (Id.) Section 19 of the Agreement memorialized Spireas' and Bolton's anticipated assignment to Hygrosol of the patent based on application No. 08/658,514:

> The parties acknowledge that after the assignment of the Patent from Spireas and Bolton to Hygrosol, Spireas and Bolton will no longer have an individual interest in the Patent or the Technology (except as shareholders of Hygrosol). Accordingly, after such assignment all consents, approvals, actions, and decisions to be made hereunder by Hygrosol, Spireas and Bolton need be made only by Hygrosol. In addition, Hygrosol, Spireas and Bolton represent, warrant and covenant with Mutual and United that during the term of this Agreement each of Bolton and Spireas, acting alone, shall have the authority to bind Hygrosol in all matters relating to this Agreement.

(Id. at 15, § 19.)

The 1998 Agreement also set forth the way Hygrosol, Spireas, and Bolton would be compensated for granting the rights to the liquisolid technology. The Agreement provided that once Mutual PA and United began making a profit on the drugs developed under the Agreement, Mutual PA and/or United would compensate Hygrosol based on a percentage of that drug's sales:

> If Mutual or United submits a New Drug Application (NDA) or an Abbreviated New Drug Application (ANDA) for a Product developed hereunder and manufactures and sells this Product, then twenty percent (20%) of the gross profit will be paid to Hygrosol quarterly.

(Id. at 3, § 4.1.)

Finally, although the 1998 Agreement was signed by Mutual PA, United, Hygrosol, Spireas, and Bolton, Section 17 provided that the obligations of the parties pursuant to the Agreement would be "binding upon, and shall insure to the benefit of the parties hereto and their heirs, executors, administrators, successors and assigns." (Id. at 15, § 17.)

## C. Spireas And Bolton Receive Four (4) Liquisolid Technology Patents

On September 1, 1998, after executing the 1998 Agreement with Mutual PA and United, Spireas and Bolton officially received their first liquisolid technology patent for application No. 08/658,514 – U.S. Patent No. 5,800,834 (the "834 Patent"). (Doc. No. 64-2 at 9; App. 54.) Then, over a year later, on October 19, 1999, Spireas and Bolton were issued their second liquisolid patent based on application No. 08/937,240 – U.S. Patent No. 5,968,550 (the "550 Patent"). (Doc. No. 64-2 at 9; App. 58.)

Shortly after executing the 1998 Agreement, Spireas and Bolton submitted an application for a third liquisolid patent on August 19, 1998. (App. 62.) Based on this application, Spireas and Bolton received U.S. Patent No. 6,096,337 (the "337 Patent") on August 1, 2000. (Id.) The 337 Patent was a "continuation-in-part" of the 834 and 550 Patents, covering additional specifications for the liquisolid technology products and processes. (Id.) On May 10, 2000, before the 337 Patent was approved, Spireas, without Bolton, submitted an application for a fourth and final liquisolid patent. (Id. at 66.) On July 23, 2002, the application was approved and Spireas received U.S. Patent No. 6,423,339 (the "339 Patent"). (Id.) The 339 Patent was a "continuation" of the 834, 550 and 337 Patents. (App. 66, 1135.)

Although Spireas and Bolton were supposed to assign their liquisolid patents to Hygrosol immediately upon issuance, Spireas admitted during his deposition that neither he nor Bolton knew how to accomplish the assignment process. (App. 1133.) It was not until Spireas received the advice of counsel in October of 2006 that he formally assigned all four liquisolid patents to Hygrosol. (App. 574, 1133, 1135.)

## D. Spireas Begins Working For Mutual PA, And Mutual PA And United License The Liquisolid Technology From Hygrosol To Develop Felodipine And Propafenone

In the late 1990s, Mutual PA was in the process of trying to develop generic felodipine and propafenone drugs, which are the active ingredients in the drugs Plendil and Rythmol, used respectively to treat high blood pressure and irregular heart rates. (Doc. No. 64-1 at 16-18.) Mutual PA was interested in developing generic propafenone and felodipine because no other company had yet done so. However, Mutual PA's efforts at the time were proving to be unsuccessful. For example, for propafenone, Mutual PA had attempted to sub-license the formulation from Knoll Pharmaceutical Company, the maker of Rythmol, but the agreement fell through. (App. 290.) For felodipine, Mutual PA had attempted its own formulation, but was advised that their formulation risked infringing on the Plendil patent owned by AstraZeneca. (App. 200-10.)

In 1999, in part to overcome the problems in the manufacture of the two drugs, Roberts offered Spireas a job as Mutual PA's Vice President of Research and Development, and Spireas accepted the position. (App. 17, 1139-41.) In this role, Spireas was responsible for overseeing the development of drugs for Mutual PA, which necessarily included Mutual PA's attempts to develop felodipine and propafenone. (Id.) Importantly, Spireas' job responsibilities at Mutual PA were distinct from the obligations he owed to the company under the 1998 Agreement.

In March of 2000, Mutual PA and United decided to invoke their rights under the 1998 Agreement and license Spireas' and Bolton's liquisolid technology from Hygrosol to develop "generic bioequivalent versions of Rythmol[4] and Plendil Extended-Release[5] . . . ." (App. 32.) On

---

[4]  Rythmol is the brand name of a drug used to treat arrhythmias. The active ingredient in Rythmol is propafenone. (Doc. No. 64-1 at 16-17.)

[5]  Plendil is the brand name of a drug used to treat hypertension. The active ingredient in Plendil is felodipine. (Doc. No. 64-1 at 18.)

11

March 7, 2000, Mutual PA, United, and Hygrosol memorialized the license in a letter signed by Roberts, on behalf of Mutual PA and United, and Spireas, on behalf of Hygrosol. (App. 32.) Shortly thereafter, and in accordance with his obligation under the 1998 Agreement to personally oversee the development of drug products, Spireas successfully developed formulations of generic felodipine and propafenone for Mutual PA and United. (Doc. No. 64-3 at 6.)

On June 6, 2000, Mutual PA submitted an Abbreviated New Drug Application ("ANDA") to the Food and Drug Administration ("FDA") for generic felodipine extended-release tablets. (Doc. No. 64-3 at 6; App. 346.) In connection with the felodipine ANDA, "URL/Mutual" created internal product development reports that explained Spireas' formulation for the felodipine tablets. (App. 1024-1052.) The product development reports, among other things, included a broad overview of the development process for felodipine, as well as a detailed review of Spireas' formulation technique. (Id.) In the felodipine report submitted as part of the record for the felodipine 10 mg tablets, the abstract stated as follows:

> Extended release tablets containing 10 mg of felodipine, a calcium channel blocker, and denoted as Felodipine ER tablets, 10 mg were developed based on novel methodology relevant to the patented technique of Liquisolid Systems.

(Id. at 1025.)

On September 28, 2000, Mutual PA submitted an ANDA to the FDA for generic propafenone tablets. (Doc. No. 64-3 at 6; App. 346.) In connection with the propafenone ANDA, "URL/Mutual" compiled propafenone product development reports similar to the ones created for felodipine. (App. 987-1023.) The abstract of the propafenone report submitted as part of the record stated as follows:

> Propafenone HCI tablets containing 300 mg of propafenone HCI, an antiarrhythmic agent, were developed based on a novel methodology relevant to the patented technique of Liquisolid Systems (Patent # US5,968,550).

(App. 987.) Spireas was an integral part of creating the product development reports for felodipine and propafenone. He testified during his deposition that he was "preparing" or "being consulted for the language, the scientific stuff in any of these product development reports, especially the ones with the high technologies, high tech." (App. 1146.)

Following Mutual PA's submission of the ANDAs to the FDA, Mutual PA and, as Mutual Delaware alleges, United,[6] began selling and distributing generic felodipine and propafenone drugs. (Doc. No. 64-1 at 25; Confidential Appendix ("Conf. App.") 1-7.)

### E. Mutual PA And United Remit Royalty Payments To Hygrosol For Felodipine And Propafenone Drugs Pursuant To The 1998 Agreement

Beginning in 2002, Mutual Delaware contends that both Mutual PA and United paid royalties to Hygrosol pursuant to the 1998 Agreement based on a percentage of their sales from generic felodipine and propafenone. From 2002 until the first quarter of 2005, Mutual PA and United remitted royalty payments to Hygrosol by check, which were drawn on an account in the name of Mutual PA. (Doc. No. 64-1 at 25; Conf. App. 1-7, 374.) Starting with the second quarter of 2005, Mutual PA and United began remitting royalty payments to Hygrosol via wire transfers, which were also drawn on an account in the name of Mutual PA. (Doc. No. 64-1 at 25, Conf. App. 374.)

On July 22, 2005, in preparation for the first wire transfer payment, Spireas wrote an email to Richard A. Kremer ("Kremer"), the Director of Finance for Mutual PA and United. (Conf. App. 332.) In the email, Spireas confirmed with Kremer that, "[a]s per our conversation, URL/Mutual

---

[6]  Spireas contends that United never made payments for felodipine and propafenone under the 1998 Agreement, and that any royalty payments made to Hygrosol under the 1998 Agreement were remitted only by Mutual PA. As discussed later in the Opinion, this is a factual issue that will be decided at trial. To the extent the Opinion references United making royalty payments under the 1998 Agreement, it does so based on Mutual Delaware's allegation that both United and Mutual PA paid Hygrosol royalties. No determination is being made that United did in fact make payments under the 1998 Agreement.

will make the payment for the Second-Quarter-2005 royalties due to Hygrosol next week." (Id.) Spireas also provided Kremer with the wire transfer information for Hygrosol's account. (Id.) On July 29, 2005, Kremer wrote an email to Spireas and Bolton to confirm that Mutual PA and United had remitted a royalty payment to Hygrosol via wire transfer. (Conf. App. 333.) Kremer also attached to his email documentation supporting Mutual PA's and United's royalty calculations. (Conf. App. 335-338.)

From then on, each wire transfer followed a format similar to the first one. Kremer would accompany Mutual PA's and United's wire transfer with an email and, attached to the email, Kremer would send Hygrosol a formal cover letter and documentation showing a breakdown of Mutual PA's and United's royalty calculations. In his emails, Kremer often stated the amount being transferred into Hygrosol's account were being made to Hygrosol by "URL/Mutual." (Conf. App. 348, 362, 367, 372, 377, 382, 387, 392, 397, 402, 407, 412, 417, 422, 428, 433, 438, 443.) In the formal cover letters, Kremer would simply state that "Mutual Pharmaceutical Company, Inc." had completed the corresponding wire transfer to Hygrosol. (Conf. App. 333, 340, 349, 353, 358, 363, 368, 373, 378, 383, 389, 393, 398, 403, 408, 413, 418, 423, 429, 434, 439, 444, 449, 454, 459, 464, 469, 474, 479, 484.) Most of the time, the documentation showing the royalty calculations for felodipine and propafenone were broken down into sales/payments for Mutual PA and United, respectively. (Conf. App. 355-56, 359-60, 364-65, 369, 375, 400, 410, 415, 420-21, 426-27, 431-32, 436-37, 441-42, 446-47, 451-52, 456-57, 461-62, 466-67, 471-72, 476-77, 481-82, 486-87, 489-92.)

Mutual PA and United kept close track of each wire transfer in their respective books and records. According to the declaration of Susan Perilli, United's Assistant Controller from September 2005 to July 2013, while wire transfer payments to Hygrosol were drawn on Mutual

PA's account, "the payments represented the total amounts of royalties owed by both Mutual PA and URL." (App. 1422.) After each wire transfer, United "would then make an inter-company transfer to Mutual PA and thereby reimburse Mutual PA for [its] portion of the royalty payments owed under the License Agreement." (App. 1422-23.) In order to keep track of what United and Mutual PA respectively owed under the 1998 Agreement, "Mutual PA and URL each had their own National Drug Code ("NDC") labels under which they would sell these generic drugs." (App. 1420.) Mutual PA and United also used separate "Company Codes" to track their sales of felodipine and propafenone – Mutual PA used assigned Code 100 and United used assigned Code 99. (App. 1422.) Based on their NDC labels and Company Codes, "the allocation of sales, revenues, royalty payments and other expenses between Mutual PA and URL . . . were based on the actual sales that each company separately made of felodipine and propafenone products, and their respective expenses." (App. 1422.)

Mutual PA and United remitted royalties to Hygrosol under the 1998 Agreement for felodipine and propafenone until the fourth quarter of 2012. Beginning with the first quarter of 2013, Mutual Delaware took over making the royalty payments in 2013 to 2015 for felodipine and propafenone under the 1998 Agreement. (See Doc. No. 64 at 27-29; App. 133-137.) As explained in more detail below, Mutual Delaware claims that in 2013 it began remitting royalty payments to Hygrosol for felodipine and propafenone because by that time, its parent corporation, Sun Pharmaceuticals Industries, LTD ("Sun Pharma") had acquired United's generics business, and Mutual Delaware had begun manufacturing and distributing the drugs. (Doc. No. 64 at 27-29.)

In any event, once Hygrosol received a royalty payment under the 1998 Agreement, the evidence shows that payments would automatically be distributed to Spireas and Bolton. (Doc. No. 64-1 at 27-28; App. 1150-51.) Spireas testified during his deposition that he and Bolton had

an agreement under which Spireas would receive fifty-five percent of the payments to Hygrosol for felodipine, and fifty percent of the payments to Hygrosol for propafenone.  (App. 1150.)

**F.  In 2011, Mutual PA And United Sue Spireas, Bolton, And Hygrosol In State Court**

Although the present action was not initiated until 2017, the parties to the 1998 Agreement were involved in a prior state court action in 2011.  On May 5, 2011, Mutual PA and United sued Spireas, Bolton, and Hygrosol in the Philadelphia County Court of Common Pleas for, among other things, breach of contract and fraudulent misrepresentation in connection with the 1998 Agreement.  (App. 139.)  The state court action arose after Mutual PA and United learned that St. John's University, where Spireas and Bolton had first met, had filed a federal lawsuit against Spireas, Bolton, and Hygrosol, asserting ownership rights to Spireas' and Bolton's liquisolid patents.[7]  (App. 139-159.)  Consequently, Mutual PA and United sued Spireas and Bolton in state court, claiming that Spireas, Bolton, and Hygrosol had misrepresented their ownership rights to the patents and had fraudulently induced Mutual PA and United to enter into the 1998 Agreement.  (App. 147-148.)

In response to the state court complaint, Spireas and Hygrosol filed thirteen counterclaims against Mutual PA and United.  (App. 507-573.)  Spireas and Hygrosol alleged, among other things, that Mutual PA and United were liable for intentionally concealing and reducing royalty payments owed to Hygrosol under the 1998 Agreement for various drug products.  (Id.)

St. John's University ultimately settled its lawsuit with Spireas, Bolton, and Hygrosol.  This led to Spireas, Hygrosol, and Bolton's Estate[8] filing a motion for summary judgment on June 25,

---

[7]  St. John's University settled its lawsuit against Spireas, Bolton, and Hygrosol on January 16, 2015.  (App. 180.)

[8]  By the time the state court issued its opinion, Bolton had passed away and his estate had taken over the litigation on his behalf.  (App. 179.)

2015 regarding Mutual PA's and United's state court complaint. (App. 189.) On March 16, 2016, the Court of Common Pleas granted summary judgment in favor of Spireas, Bolton, and Hygrosol, which the Superior Court affirmed on April 3, 2017. (App. 179-191.) Spireas' and Hygrosol's counterclaims were not resolved in the Court of Common Pleas opinion. Instead, the counterclaims were later resolved privately in a settlement agreement executed on October 18, 2018 between Spireas, Hygrosol, and Takeda (who, by then, had become the successor-in-interest to Mutual PA).[9] (App. 138-60.)

### G. Takeda Pharmaceuticals Acquires Mutual PA And United In 2012, And Sells The Generic Drug Business of Mutual PA And United To Sun Pharmaceutical in 2013

In 2012, Takeda acquired URL Pharma, Inc., the parent corporation of Mutual PA and United. (Doc. No. 64-2 at 3.) Then, in February 2013, Takeda sold URL Pharma, Inc.'s generic drug business to Sun Pharmaceutical Industries, LTD ("Sun Pharma"). (Doc. No. 64-2 at 3.) This sale included URL Pharma, Inc.'s assets which included felodipine and propafenone. (Doc. No. 64-2 at 3.) The Sun Pharma acquisition marked the end of Mutual PA's and United's relationship as sister corporations, since Takeda retained ownership over Mutual PA while United joined URL Pharma, Inc. to become a subsidiary of Sun Pharma. (Doc. No. 64-2 at 3; App. 596, 598.)

In addition to Sun Pharma's acquisition of United/URL Pharma, Inc. in February 2013, Sun Pharma acquired on May 2, 2013 the Plaintiff in this case, Mutual Delaware. (Doc. No. 64-2 at 3; App. 923.) Not to be confused with Mutual PA, Mutual Delaware is, as its name suggests, a Delaware corporation that was formed on July 11, 2012. (Doc. No. 64-2 at 3; App. 923.)

---

[9] See Section II.G., infra. This is the same settlement agreement that resolved the claims Takeda asserted against Spireas in this case. (App. 138-160.)

Two years later, in April 2015, United/URL Pharma, Inc. merged with another subsidiary of Sun Pharma named URL Pharma, Inc., a Delaware corporation ("URL Delaware").[10] (Doc. No. 64-2 at 4; App. 952-954.) Shortly after United/URL Pharma, Inc. merged into URL Delaware, URL Delaware merged into Mutual Delaware. (Doc. No. 64-2 at 4; App. 955-957.) As a result, Mutual Delaware absorbed United in 2015.

## H. In 2013, The Internal Revenue Service ("IRS") Challenges Spireas' Treatment Of The Hygrosol Royalty Payments

In 2013, the Internal Revenue Service ("IRS") served a deficiency notice on Spireas and his wife for their treatment on their personal tax returns of the royalty payments Spireas received from Hygrosol. (Doc. No. 64-3 at 9; Doc. No. 69-2 at 15.) During the ensuing tax court proceedings, Spireas made statements indicating that his patented liquisolid technology was not actually used in his formulations of felodipine and propafenone under the 1998 Agreement. (App. 1222-1414.) For example, Spireas testified before the United States Tax Court as follows:

Question: So I'm just going to ask you some question about Exhibits 1, 2, and 3 collectively. Who were the inventors on patents 1 [the 834 Patent], 2 [the 550 Patent], 3 [the 337 Patent]?

Answer: Myself and Mr. Bolton.

Question: And did these patents cover the felodipine and propafenone formulation technologies?

Answer: Definitely not.

(App. 1293-94; see also Conf. App. 579-80.) Moreover, in Spireas' answering brief, filed with the tax court in 2015 after the trial, he specifically denied that his felodipine and propafenone formulations used the patented technology:

---

[10] United's parent corporation, URL Pharma, Inc., and URL Delaware appear to have the same name, but URL Pharma, Inc. and URL Delaware were two distinct corporations prior to the merger. (Doc. No. 64-3 at 4.)

Respondent surreptitiously attempts to conflate Dr. Spireas' unique and patentable felodipine and propafenone technologies with the distinctly different technologies included in Dr. Spireas' four liquisolid patents. By suggesting that Dr. Spireas did not somehow transfer all substantial rights to the "liquisolid patents" to URL/Mutual, respondent attempts to imply that the same is true for the patentable felodipine and propafenone technologies, which it is not.

The four issued liquisolid patents could not be used to develop the felodipine and propafenone generic products that generated the royalty income here. . . .

(App. 1073.)

## I. Ensuing Procedural History Of This Case

Following the discovery of Spireas' Tax Court testimony, Takeda initiated this case by filing a Complaint against Spireas on January 31, 2017. (Doc. No. 1.) In the Complaint, Takeda alleged that Spireas had falsely represented to Mutual PA that the felodipine and propafenone drug products were created by using the patented liquisolid technology and, for this reason, Spireas was not entitled to any royalty payments made by Mutual PA pursuant to the 1998 Agreement. (Doc. No. 1.) Takeda alleged claims against Spireas for fraud/misrepresentation (Count I), breach of contract (Count II), breach of duty of loyalty (Count III), breach of fiduciary duty (Count IV), conversion (Count V), and money had and received (Count VI). (Id.)

On April 3, 2017, Spireas filed a Motion to Dismiss the Complaint in its entirety under Federal Rule of Civil Procedure 12(b)(6). (Doc. No. 16.) In the Motion to Dismiss, Spireas argued that (1) Takeda's claims were barred by res judicata, or claim preclusion, as a result of the related state court action; (2) Takeda's fraud claims (Count I) were implausible; (3) the Complaint must be dismissed for Takeda's failure to join United as a necessary and indispensable party; (4) Takeda's claims for fraud/misrepresentation (Count I), breach of duty of loyalty (Count III), breach of fiduciary duty (Count IV), conversion (Count V), and money had and received (Count VI) were barred by the applicable statutes of limitation with the exception of the claim for breach of contract

(Count II); and (5) Takeda's claims with the exception of the breach of contract claim were barred by the gist of the action doctrine. (Id.)

On October 3, 2017, the Court issued an Opinion (Doc. No. 33) and Order (Doc. No. 34), granting in part and denying in part the Motion to Dismiss. The Court rejected in part Spireas' arguments and held that (1) Takeda's claims were not barred by res judicata, and (2) Takeda's claims for fraud/misrepresentation (Count I), breach of duty of loyalty (Count III), breach of fiduciary duty (Count IV), conversion (Count V), and money had and received (Count VI) were not barred by the applicable statutes of limitations. (Doc. No. 33.) As to Spireas' argument regarding the gist of the action doctrine, the Court agreed with Spireas that the gist of the action doctrine barred Takeda's claims for fraud/misrepresentation (Count I), breach of duty of loyalty (Count III), breach of fiduciary duty (Count IV), and conversion (Count V), but disagreed that it barred Takeda's claim for money had and received (Count VI). The Court held that Takeda had sufficiently stated a claim for breach of contract (Count II) and for money had and received (Count VI) to survive Spireas' Motion to Dismiss.

On the issue of joinder, the Court agreed with Spireas that United was a necessary and indispensable party to the case, but because United no longer existed, the Court ordered that Mutual Delaware, United's successor-in-interest, be joined in its place. (Id. at 20-25) The Court also afforded Takeda leave to amend the Complaint. (Id. at 41-42.)

On October 24, 2017, Takeda and Mutual Delaware, together as Plaintiffs, filed an Amended Complaint against Spireas, alleging claims only for breach of contract (Count I) and money had and received (Count II).[11] (Doc. No. 35.) Almost exactly one year later, on October

---

[11] In the Amended Complaint, Takeda and Mutual Delaware preserved for appeal the previously-dismissed claims of fraud/misrepresentation, breach of duty of loyalty, breach of fiduciary duty, and conversion. (Doc. No. 35 at 16-20.)

25, 2018, Takeda filed a stipulation informing the Court that it had settled its claims with Spireas and was therefore agreeing to voluntarily dismiss its claims in this case. (Doc. No. 45.) Consequently, on October 29, 2018, the Court entered an Order dismissing Takeda as a Plaintiff in the case pursuant to Federal Rule of Civil Procedure 41. (Doc. No. 46.) Thus, Mutual Delaware remained as the only Plaintiff.

On February 28, 2019, Spireas filed the present Motions for Summary Judgment against Mutual Delaware.[12] (Doc. Nos. 60, 61.) In his first Motion, Spireas seeks summary judgment on Mutual Delaware's claims for breach of contract and money had and received. (Doc. No. 60.) Spireas argues that (1) Mutual Delaware lacks standing to sue for breach of contract because only Mutual PA invoked the 1998 Agreement when it signed the March 2000 letter licensing the liquisolid technology for felodipine and propafenone; (2) Mutual Delaware lacks standing to sue for breach of contract because its alleged predecessor-in-interest, United, also lacks standing; (3) Mutual Delaware cannot recover payments made to Hygrosol because there is no evidence that United ever paid Hygrosol; (4) Mutual Delaware cannot maintain its claims because the royalty payments under the 1998 Agreement were made to Hygrosol, not to Spireas; (5) Mutual Delaware cannot recover the royalty payments made to Hygrosol because it would involve disregarding the corporate veils of Mutual PA and United, as well as the corporate veil of Hygrosol; (6) Mutual Delaware's claims are barred by the settlement reached between Spireas and Takeda; (7) even if United/Mutual Delaware made payments under the 1998 Agreement, they did so because of a

---

[12] On the same day, Mutual Delaware filed a <u>Daubert</u> Motion to Exclude the Opinions and Report of Defendant's Proffered Expert, Gregory Cowhey (Doc. No. 59). Defendant filed a Response in Opposition on March 28, 2019 (Doc. No. 65). This Motion will be resolved in an Order filed contemporaneously with this Opinion.

mistake of law, not a mistake of fact; and (8) Mutual Delaware's claims are barred by <u>res judicata</u> and <u>collateral estoppel</u> as a result of the state court action. (<u>Id.</u>)

In the second Summary Judgment Motion, Spireas seeks judgment specifically regarding Mutual Delaware's claim in Count II for money had and received based on alleged false pretenses. (Doc. No. 61.) In this Motion, Spireas argues that he is entitled to summary judgment on the money had and received claim because the claim rests on Mutual Delaware's allegations that Spireas intentionally misrepresented to Mutual PA and United that his patented liquisolid technology was being used in his felodipine and propafenone drug products. (<u>Id.</u>) Spireas contends that Mutual Delaware cannot maintain the claim because Mutual Delaware has no evidence to show that Spireas engaged in such fraudulent conduct or made the alleged misrepresentations. (<u>Id.</u>) Spireas also argues that Mutual Delaware cannot maintain this claim because Mutual PA made an informed decision to pay Hygrosol royalties under the 1998 Agreement based on its extensive knowledge about the felodipine and propafenone formulations, and not because it was "tricked" by Spireas. (<u>Id.</u>)

On March 28, 2019, Mutual Delaware filed a Response in Opposition to both Motions for Summary Judgment. (Doc. No. 64.) In response to the first Motion, Mutual Delaware argues that (1) both United, and Mutual Delaware, as United's successor-in-interest, have standing to sue under the 1998 Agreement; (2) genuine disputes of material fact exist as to whether United/Mutual Delaware made royalty payments under the 1998 Agreement such that summary judgment is improper; (3) Mutual Delaware can maintain a claim for breach of contract and money had and received because evidence in the record shows that Spireas, and not just Hygrosol, received royalty payments under the 1998 Agreement; (4) Spireas' arguments about piercing the corporate veil are irrelevant and nevertheless fail; (5) the settlement agreement executed between Takeda and Spireas

does not preclude Mutual Delaware's claims in this case; (6) Mutual Delaware made royalty payments to Spireas because of his "fraudulent and inequitable conduct," not because of a mistake of law; and (7) Spireas cannot argue that Mutual Delaware's claims are barred by <u>res judicata</u> or <u>collateral estoppel</u> because the same argument was rejected at the motion to dismiss stage of these proceedings.  (<u>Id.</u>)

In response to the second Motion for Summary Judgment, Mutual Delaware argues that summary judgment as to its claim for money had and received is improper because (1) genuine disputes of material fact exist as to whether Spireas received money from Mutual Delaware; (2) there is a genuine dispute of material fact as to whether Spireas made misrepresentations about felodipine and propafenone; and (3) that Mutual PA's knowledge about felodipine and propafenone formulations is irrelevant to the fact that Mutual PA and United were tricked by Spireas into believing that the propafenone and felodipine formulizations used his patented technology.  (<u>Id.</u>)

On April 12, 2019, Spireas filed Reply Briefs in support of both of his Motions for Summary Judgment (Doc. Nos. 68, 69).  On July 2, 2019, the Court held a hearing on the Motions for Summary Judgment and heard oral argument from counsel for Mutual Delaware and Spireas. Following the hearing, the Court entered an Order allowing the parties additional time to submit supplemental memoranda on the Motions for Summary Judgment.  (Doc. No. 72.)  On July 29, 2019, Spireas submitted a supplemental brief in support of his Motions for Summary Judgment (Doc. No. 76), and Mutual Delaware submitted a supplemental Response in Opposition to the Motions (Doc. No. 77).

The Motions for Summary Judgment are now ripe for disposition.  For the reasons that follow, the Motions will be denied.

## III.    STANDARD OF REVIEW

Granting summary judgment is an extraordinary remedy.  Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In reaching this decision, the court must determine whether "the pleadings, depositions, answers to interrogatories, admissions, and affidavits show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Favata v. Seidel, 511 Fed. App'x 155, 158 (3d Cir. 2013) (quoting Azur v. Chase Bank, USA, Nat'l Ass'n, 601 F.3d 212, 216 (3d Cir. 2010)).  A disputed issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party.  Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  For a fact to be considered "material," it "must have the potential to alter the outcome of the case." Favata, 511 Fed. App'x at 158.  Once the proponent of summary judgment "points to evidence demonstrating no issue of material fact exists, the non-moving party has the duty to set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor." Id. (quoting Azur, 601 F.3d at 216).

In deciding a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." Id. (alteration in original) (quoting Chambers ex rel. Chambers v. Sch. Dist. of Philadelphia Bd. of Educ., 587 F.3d 176, 181 (3d Cir. 2009)).  The Court's task is not to resolve disputed issues of fact, but to determine whether there exist any factual issues to be tried. Anderson, 477 U.S. at 247-49.  Whenever a factual issue arises which cannot be resolved without a credibility determination, at this stage the Court must credit the nonmoving party's evidence over that presented by the moving party. Id. at 255.  If there is no factual issue, and if only one reasonable conclusion could arise from the record regarding the

potential outcome under the governing law, summary judgment must be awarded in favor of the moving party. Id. at 250.

## IV.    ANALYSIS

As previously noted, Spireas has filed two motions for summary judgment.  In his first, all-encompassing Motion, Spireas argues for summary judgment on Mutual Delaware's claims for breach of contract (Count I), and money had and received (Count II).  (Doc. No. 60.)  Spireas argues that there are no genuine issues of material fact and that he is entitled to judgment as a matter of law on both claims because (1) neither Mutual Delaware nor United have standing to sue under the 1998 Agreement; (2) Mutual Delaware cannot recover money that United may have transferred to Mutual PA, but never paid directly to Hygrosol; (3) Spireas never received payments under the 1998 Agreement, only Hygrosol did; (4) Mutual Delaware cannot pierce the corporate veils of Mutual PA, United, and Hygrosol in order to maintain its claims against Spireas; (5) Takeda has already released any viable claims against Spireas by virtue of the October 2018 settlement agreement; (6) the payments made by Mutual PA under the 1998 Agreement were made voluntarily and, if anything, as a result of an unprovoked mistake of law; and (7) Mutual Delaware's claims in this case are barred by the doctrines of res judicata and collateral estoppel because they are duplicative with the claims asserted by Mutual PA and United in the state court action.  (Doc. No. 60.)

Spireas' second Motion for Summary Judgment seeks judgment as a matter of law specifically with respect to Mutual Delaware's claim in Count II for money had and received. (Doc. No. 61.)  In this "companion motion," Spireas argues that he is entitled to summary judgment on the money had and received claim because Mutual Delaware premises the claim on allegations of Spireas' fraud, yet (1) Mutual Delaware has no evidence to show that Spireas engaged in

fraudulent conduct; and (2) the payments made under the 1998 Agreement to Hygrosol for propafenone and felodipine were knowing and voluntary.  (Id.)

The Court will address these arguments, in turn, below.

### A.  Mutual Delaware Has Standing To Sue Under The 1998 Agreement

Spireas first argues that he is entitled to summary judgment because Mutual Delaware has no standing to sue under the 1998 Agreement since Mutual Delaware was not a party to the Agreement.  (Doc. No. 60 at 10-11.)  Because Mutual Delaware is the successor-in-interest to United, an original party to the 1998 Agreement, the Court disagrees.

The requirement that a party have standing to sue is fundamental to ensuring that courts only intervene in controversies that are "real and concrete, rather than abstract."  Camp Ne'er Too Late, LP v. Swepi, LP, 185 F. Supp. 3d 517, 540 (M.D. Pa. 2016) (internal quotations and citations omitted).  To that end, "[a] party has standing to bring a cause of action if it is 'aggrieved' by the actions complained of, that is, if its interest in the outcome of the litigation is substantial, direct, and immediate."  Id.  With respect to breach of contract cases, a party is "aggrieved" and therefore has standing to bring a breach of contract claim only if they are a party to the contract at issue.  ECN Financial, LLC v. Chapman, No. 17-2842, 2018 WL 623679, at *3 (E.D. Pa. Jan. 30, 2018) (quoting Dunkin Donuts Franchised Restaurants, LLC v. Claudia I, LLC, No. 12-2010, 2013 WL 3716515, at *3 (E.D. Pa. July 15, 2013)).

In this case, there is no dispute that the original parties to the 1998 Agreement were Mutual PA, United, Spireas, Bolton, and Hygrosol.  Since 1998, however, both Mutual PA and United have ceased to exist.  As noted, Takeda has become the successor-in-interest to Mutual PA and, importantly, Mutual Delaware has become the successor-in-interest to United.  The Court noted as much in its Opinion on the Motion to Dismiss, when it ruled that Mutual Delaware, as United's successor, must be joined as a Plaintiff in this litigation.  (Doc. No. 33.)  Now, with the benefit of

a record, the Court is satisfied that there is ample evidence to support that Mutual Delaware is in fact United's successor. (App. 596, 598, 951-57.) The evidence showing the relevant merger and acquisition history of the companies reveals that Sun Pharma acquired United in February 2013 and, three months later, acquired Mutual Delaware. (Doc. No. 64-2 at 3; App. 923.) In April 2015, United merged into Mutual Delaware. (Doc. No. 64-2 at 4; App. 952-954.)

Based on this corporate history, Mutual Delaware became United's successor in April 2015 and, at that time, assumed United's rights and obligations under the 1998 Agreement. The 1998 Agreement, by its own terms, explicitly binds successors of the original contracting parties by stating: "This Agreement shall be binding upon, and shall inure to the benefit of the parties hereto and their heirs, executors, administrators, successors and assigns." (App. 15 at § 17.)

Accordingly, Mutual Delaware has standing to enforce the 1998 Agreement to the same extent that United, as an original party to the 1998 Agreement, would have had if it were still a separate company that exists today. For this reason, Spireas' argument as to Mutual Delaware's lack of standing fails.

### B. United Has Standing To Sue Under The 1998 Agreement

Spireas argues that even if Mutual Delaware became United's successor in 2015, Mutual Delaware's claims fail because United lacked standing to sue under the 1998 Agreement since United never triggered its rights under the Agreement by "purchasing" a product license for felodipine and propafenone. (Doc. No. 60 at 11.) Spireas interprets the 1998 Agreement to require that the rights under the Agreement are "triggered" by Hygrosol issuing Mutual PA and/or United a license to develop a specific drug product. (Id.) With respect to felodipine and propafenone, Spireas argues that it was the March 7, 2000 letter between himself, on behalf of Hygrosol, and Roberts, on behalf of "Mutual," that triggered the 1998 Agreement. In this regard, Spireas contends that Roberts executed the March 7, 2000 letter only on behalf of Mutual PA, not United,

and for this reason, United never triggered its rights under the 1998 Agreement and therefore lacks standing to sue.

At the outset, Mutual Delaware submits that Spireas should be judicially estopped from asserting that United lacks standing because the argument is contrary to what he argued at the motion to dismiss stage of these proceedings. (Doc. No. 64 at 15-20.) At that stage, Spireas argued that the original complaint should be dismissed because Takeda had failed to join United as a Plaintiff. Spireas had argued that United was a necessary and indispensable party to the case because it had enforceable rights under the 1998 Agreement. (App. 392-97.) The Court agreed with Spireas that United was a necessary and indispensable party. (Doc. No. 33.) But because United was no longer in existence, the Court ordered that Mutual Delaware, as United's successor-in-interest, be joined in its place. (Doc. Nos. 33, 34.) Mutual Delaware contends that Spireas is now improperly attempting to "have it both ways" by claiming that United has no standing to enforce its rights under the 1998 Agreement. (Doc. No. 64 at 15-18.) The Court agrees.

In <u>Ryan Operations G.P. v. Santiam-Midwest Lumber Co.</u>, the Third Circuit Court of Appeals explained the doctrine of judicial estoppel as follows:

> Judicial estoppel, sometimes called the "doctrine against the assertion of inconsistent positions," is a judge-made doctrine that seeks to prevent a litigant from asserting a position inconsistent with one that she has previously asserted in the same or in a previous proceeding. It is not intended to eliminate all inconsistencies, however slight or inadvertent; rather, it is designed to prevent litigants from "playing 'fast and loose with the courts.'" <u>Scarano v. Central R. Co. of New Jersey</u>, 203 F.2d 510, 513 (3d Cir.1953) (citation omitted). "The basic principle . . . is that absent any good explanation, a party should not be allowed to gain an advantage by litigating on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory." 18 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 4477 (1981), p. 782.

81 F.3d 355, 358 (3d Cir. 1996).

In this case, judicial estoppel precludes Spireas from arguing that United lacks standing because the arguments directly contradict the arguments raised in the Motion to Dismiss. In the Motion to Dismiss, Spireas argued as follows with respect to United (referred to as "URL" in the Motion) being a necessary and indispensable party:

> URL [United] is a fully executed party to [the 1998 Agreement], and Takeda is attempting to re-litigate Mutual [PA]'s and URL's purported rights under that Agreement with the very practical impact of impeding or impairing any rights that URL might have under it.
>
> ***
>
> The prejudice to URL in proceeding without it in this litigation concerning its contract rights is severe.
>
> ***
>
> Simply put, there is no precaution or safeguard that can be put in place and afford adequate relief to the litigation parties without URL as a party. . . . the issues that must be decided in order to award damages will directly adjudicate URL's rights under the 1998 Hygrosol License Agreement. A judgment in this case requires a determination of Mutual [PA]'s and URL's rights to the Products relative to Dr. Spireas, Mutual [PA] and URL under the 1998 Hygrosol License Agreement. Either the Hygrosol Technology was used, or it was not. That finding cannot change in subsequent actions and no relief can be afforded in this litigation without making that determination, which, by the terms of the Agreement, impacts URL.

(App. 393-97.)

Despite previously arguing for United's joinder, now, at the summary judgment stage of the proceedings, Spireas takes the opposite approach. Spireas argues that United has no rights under the 1998 Agreement because "[i]ts rights under the 1998 Agreement would have been triggered only if Hygrosol issued it a product license or if [Mutual PA] purchased a license that included United" and "[n]either event ever occurred." (Doc. No. 60 at 11.) The contradiction in his argument is not "slight or inadvertent," but rather a glaring example of the exact type of gamesmanship that the doctrine of judicial estoppel seeks to avoid. As such, the Court agrees with

Mutual Delaware that judicial estoppel precludes Spireas from arguing that United lacks standing to sue under the 1998 Agreement.

Aside from judicial estoppel, Mutual Delaware disputes Spireas' interpretation of the 1998 Agreement and his characterization of the March 7, 2000 letter.  (Doc. No. 64 at 19.)  Mutual Delaware submits that the March 2000 letter "did not serve to license or otherwise alter the exclusive rights granted to both Mutual PA and URL under the 1998 License Agreement," but rather carried out one of the requirements of the Agreement, which was that the parties memorialize the collective decision to develop certain drugs.  (Id.)  Moreover, Mutual Delaware argues that even if the March 2000 letter altered the rights under the 1998 Agreement, it does not matter for purposes of United's standing because both United and Mutual PA executed the letter memorializing the decision to develop felodipine and propafenone.  (Id. at 20.)

The Court agrees with Mutual Delaware that United executed the March 2000 letter with Mutual PA such that regardless of whether the letter is a "triggering" document, United has standing to sue under the 1998 Agreement.  The body of the March 7, 2000 letter, which was written from Roberts to Spireas, reads as follows:

> This letter is the formal engagement of Hygrosol and Mutual, for generic bioequivalent versions of Rhythmol, and Plendil Extended-Release, as well as maximally bioavailable formulations of Propafenone, in accordance with the License Agreement between Hygrosol and Mutual dated June 12, 1998.

> Attached with this letter is a check for Thirty Thousand Dollars ($30,000), for engagement of these three products, in accordance with the License Agreement.

(App. 32.)  Although the body of the letter refers generally to "Mutual," an undefined term, the Court is satisfied that "Mutual" includes both Mutual PA and United.  This is so because Roberts, the President and CEO of Mutual PA and United, wrote the letter to Spireas and signed it on behalf of both companies.  (Id.)  The letter was printed on Mutual PA's and United's shared letterhead,

with a "URL/Mutual" logo at the top.  (Id.)  The letter also references the 1998 Agreement, which both Mutual PA and United signed.

Accordingly, the Court is satisfied that United has standing to sue under the 1998 Agreement both because of judicial estoppel, and because it "triggered" its rights under the 1998 Agreement by licensing Spireas' liquisolid technology for felodipine and propafenone.

### C. Genuine Disputes Of Material Fact Exist As To Whether United Paid Royalties To Hygrosol Under the 1998 Agreement

Spireas argues that he is entitled to summary judgment because Mutual Delaware's claim for relief is "predicated almost entirely on the pretense that United . . . was making license fee payments under the 1998 Agreement."  (Doc. No. 60 at 13.)  He argues that Mutual Delaware "has failed to adduce any evidence that United every paid a nickel in license fees to Hygrosol (or especially Dr. Spireas) during the twenty years since the 1998 Agreement was signed."  (Id.) Spireas contends that, at best, there may have been internal expense allocations between United and Mutual PA for felodipine and propafenone, but that even if that were true, internal expense allocations between affiliated companies do not constitute "payments" that are capable of being "clawed back."

Mutual Delaware does not contest that its claim for relief is predicated on the fact that it and United remitted royalty payments to Hygrosol under the 1998 Agreement.  But Mutual Delaware argues that summary judgment is improper because it has produced substantial evidence to demonstrate that United and Mutual Delaware "made royalty payments under the 1998 License Agreement on the sales of generic felodipine and propafenone." (Doc. No. 64 at 21.)  As explained below, the Court is satisfied that at this stage of the proceedings, Mutual Delaware has produced enough evidence to create a genuine issue of material fact as to whether both it and United made royalty payments under the 1998 Agreement such that summary judgment is not warranted.

31

1. **Enough Evidence Has Been Offered To Create Genuine Disputes Of Material Fact As To Whether United Made Royalty Payments Under The 1998 Agreement From 2002 To 2013**

As previously mentioned, Spireas argues that there is no evidence that United made royalty payments under the 1998 Agreement to Hygrosol for felodipine and propafenone. (Doc. No. 60 at 13-16.) Spireas contends that Mutual PA was the only party to remit royalty payments for the drugs to Hygrosol. (Id.) Mutual Delaware argues that both United and Mutual PA made royalty payments for the drugs to Hygrosol in accordance with the 1998 Agreement and, further, that evidence of record supports that there is a genuine dispute of material fact on this issue which precludes summary judgment.

Mutual Delaware relies on the declaration of Susan Perilli, the current Associate Director of Accounting and Finance at Sun Pharma, the parent company of Mutual Delaware and the parent company of United when it existed, in arguing that its evidence supports that United remitted royalty payments to Hygrosol under the 1998 Agreement. (Doc. No. 64 at 21-23; App. 1418-1423.) From 2005 to 2013, Perilli served as United's Assistant Controller, a job that, among other things, required her to reconcile the general ledgers of Mutual PA and United, and handle various other financial matters for the companies. (App. 1418-1419.) According to Perilli, "[w]hile Mutual PA was responsible for the manufacture of the generic felodipine and propafenone at issue in this litigation, both Mutual PA and URL [United] distributed and sold these products." (App. 1420.)

Perilli's explains in her Declaration how the sales of felodipine and propafenone were kept separate and organized between Mutual PA and United. Mutual PA and United each sold felodipine and propafenone under a unique label called a National Drug Code ("NDC") number - United's NDC number began with "00677" and Mutual PA's NDC number started with "53489." (App. 1421.) Beyond that, Mutual PA and United were each assigned a "Company Code" – drug sales

made by Mutual PA were listed under Company Code 100, and drug sales made by United were listed under Company Code 99. (App. 1421-22.) Based on this system of recordkeeping, the sales and revenues of felodipine and propafenone were allocated to United and Mutual PA, respectively, and royalty payments were calculated accordingly. From there, Mutual PA remitted royalty payments to Hygrosol from its bank account on behalf of both companies, but "United would then make an inter-company transfer to Mutual PA" thereby reimbursing Mutual PA for its portion of the royalty payment. (App. 1422-23.)

Spireas argues that even if United made inter-company transfers to cover its share of the royalty payments, such transfers are internal expense allocations and not "payments" that can be clawed back by Mutual Delaware. Spireas contends that "[i]f United's affiliate paid money on its behalf . . . United suffered no cognizable harm and cannot sue to recover it." (Doc. No. 60 at 14.) In support of this argument, Spireas relies on a legal malpractice case from the Western District of Pennsylvania, General Nutrition Corp. v. Gardere Wynne Sewell, LLP, 727 F. Supp. 2d 377, 385-86 (W.D. Pa. 2010). In General Nutrition, the plaintiff, GNC, sued its law firm, defendant Gardere Wynne Sewell, LLP, alleging legal malpractice in connection with an underlying suit between GNC and one of its advertisers. Id. at 381-82. GNC sued the defendant to recover the amount of money it had paid to settle the underlying lawsuit. However, GNC did not actually pay the settlement in the underlying lawsuit. Rather, General Nutrition Incorporated, another corporation with the "GNC family of companies," had paid the settlement on behalf of GNC. Id.

Although GNC had not paid the settlement in the underlying lawsuit, it recorded in its books that it owed an "inter-company liability to General Nutrition Incorporated" for the settlement proceeds. Id. at 381. Aside from recording the liability, however, "[t]here were no promissory notes or other documents executed between [the] related corporations regarding [the]

transaction" to prove that GNC paid General Nutrition Incorporated the amount owed. <u>Id.</u> Consequently, on summary judgment, the defendant argued that GNC had not suffered an "actual loss" in the underlying lawsuit such that it could maintain its legal malpractice claims. 727 F. Supp. 2d at 383-84. The court agreed with defendant, finding that GNC had not incurred an actual loss in the underlying lawsuit because GNC never paid "its inter-company liability to General Nutrition Incorporated" for the settlement proceeds. <u>Id.</u> at 384.

This case is readily distinguishable from <u>General Nutrition</u>. Here, Mutual Delaware has produced evidence that shows that United did not simply record "inter-company liability" to Mutual PA, but rather that it transferred funds to Mutual PA to cover its portion of the felodipine and propafenone royalty payments. In addition to Perilli's Declaration, Mutual Delaware has produced voluminous documents purporting to show that United reimbursed Mutual PA for royalty payments owed to Hygrosol under the 1998 Agreement. (Conf. App. 333-432.) As noted earlier, Richard A. Kremer ("Kremer"), the Director of Finance for Mutual PA and United, accompanied each wire transfer payment to Hygrosol with an email that attached a formal cover letter and documentation to support the royalty payments being made. (Conf. App. 332.) In both the emails and cover letters, Kremer often stated that the wire transferred payments were coming from "URL/Mutual" collectively. (Conf. App. 348, 362, 367, 372, 377, 382, 387, 392, 397, 402, 407, 412, 417, 422, 428, 433, 438, 443.) And in the supporting documentation, payments for felodipine and propafenone were often broken down into payments owed by Mutual PA and United. (Conf. App. 355-56, 359-60, 364-65, 369, 375, 400, 410, 415, 420-21, 426-27, 431-32, 436-37, 441-42, 446-47, 451-52, 456-57, 461-62, 466-67, 471-72, 476-77, 481-82, 486-87, 489-92.)

Based on the foregoing, and unlike in <u>General Nutrition</u>, Mutual Delaware has produced evidence to create a genuine issue of fact as to whether United suffered an "actual loss" under the

1998 Agreement by making royalty payments for felodipine and propafenone, even if those payments were reimbursements sent to Mutual PA. Thus, Spireas is not entitled to summary judgment based on his argument that United never made royalty payments.[13]

### 2. Genuine Disputes Of Material Fact Exists As To Whether Mutual Delaware, A Successor to United, Made Royalty Payments Under The 1998 Agreement

As noted, Mutual Delaware submits that from 2013 to 2016, it took over making royalty payments for felodipine and propafenone from United pursuant to the 1998 Agreement because by 2013, "Mutual Delaware had acquired the generics business of URL and was manufacturing and selling these drugs . . . ." (Doc. No.64 at 28.) In support of its claim that it made royalty payments under the 1998 Agreement, Mutual Delaware relies in part on a report submitted by one of Spireas' damages experts in this case, Gregory Cowhey, ASA/CVA.[14] Spireas retained Mr. Cowhey to evaluate the damages, if any, that Mutual Delaware suffered in connection with this lawsuit. In Mr. Cowhey's report, he stated the following with respect to Mutual Delaware's (referred to in the report as "New Mutual") damages:

---

[13] Spireas also argues that he is entitled to summary judgment on Mutual Delaware's claims because Mutual Delaware is attempting to "collapse the separate identity of both United and [Mutual PA] in order to contend payments made by the latter were actually made by the former." (Doc. No. 60 at 19.) Though Spireas couches this argument as a piercing the corporate veil argument, it is, in substance, a repetition of his contention that United never made royalty payments under the 1998 Agreement. Because the Court has already determined that there is substantial evidence to create a genuine issue of material fact as to whether United made payments under the 1998 Agreement, the Court need not address Spireas's "piercing the corporate veil" argument as it pertains to the separate corporate existences of Mutual PA and United.

[14] The designations after Mr. Cowhey's name stand for for Accredited Senior Appraiser ("ASA") and Certified Valuation Analyst ("CVA"). As noted previously, on February 28, 2019, Mutual Delaware filed a Daubert Motion to Exclude the Opinions and Report of Defendant's Proffered Expert, Gregory Cowhey (Doc. No. 59), to which Defendant filed a Response in Opposition on March 28, 2019 (Doc. No. 65). The motion will be resolved in a separate Order. The brief discussion of Mr. Cowhey's report in this Opinion will have no bearing on the decision on the Daubert Motion.

> Finally, we have considered whether New Mutual sold the two drug products after February 2013. We performed the same searches of records described above [for United] and it appears that, after February 2013, New Mutual sold propafenone and felodipine only until a date before November 2016.

(App. 966.)

In addition to the expert report, Mutual Delaware relies on a letter written to Hygrosol accompanying a March 3, 2016 wire transfer payment to prove that it made payments to Hygrosol for felodipine and propafenone under the 1998 Agreement. (Conf. App. 133.) In the letter, much like Kremer's cover letters that accompanied prior wire transfers, the body of the letter stated that "Mutual Pharmaceutical Company, Inc." had "wire-transferred a sum certain to Hygrosol's bank account for royalty payments for felodipine and propafenone pursuant to the 'license agreement.'" (Id.) Mutual Delaware argues that it is the "Mutual Pharmaceutical Company, Inc." referenced in this letter because as of March 3, 2016, Mutual Delaware had acquired United. (Doc. No. 64 at 28-29.)

Mutual Delaware's evidence supporting the fact that it made royalty payments is far from overwhelming. But at this stage of the proceedings, the Court is satisfied that the evidence, viewed in the light most favorable to Mutual Delaware as the non-moving party, is sufficient to create a genuine issue of material fact as to whether it made royalty payments under the 1998 Agreement. Consequently, summary judgment is not warranted.

### D. Genuine Disputes Of Material Fact Exist As To Whether Spireas Received Royalty Payments From Hygrosol For Felodipine And Propafenone Under The 1998 Agreement

Spireas argues that he is entitled to summary judgment on Mutual Delaware's claims for breach of contract and money had and received because both claims require Mutual Delaware to prove that Spireas received money under the 1998 Agreement. (Doc. No. 60 at 15-16.) Spireas contends that he did not receive royalty payments under the 1998 Agreement for felodipine and

propafenone because the payments owed under the 1998 Agreement were remitted to Hygrosol and Hygrosol only. (Id. at 15-19.) Further, Spireas argues that even if he received royalty payments for felodipine and propafenone from Hygrosol, Mutual Delaware cannot recover those payments because recovery would necessarily involve piercing Hygrosol's corporate veil. (Id. at 21-23.)

Mutual Delaware does not dispute that the royalty payments under the 1998 Agreement were first remitted to Hygrosol. (See Doc. No. 64 at 29.) Notwithstanding this fact, Mutual Delaware argues that it is irrelevant whether the payments first went through Hygrosol because "Spireas received a significant portion of these payments." (Id. at 30.) Specifically with respect to its claim for money had and received, Mutual Delaware argues that the claim "does not depend on how the money came to be in Spireas's possession, just that he received it without providing valuable consideration for it." (Id. at 30-31.)

Regarding its claim for breach of contract, Mutual Delaware argues that piercing the corporate veil is irrelevant because its claim is premised on Spireas' breach of the personal obligations he owed to Mutual PA and United under the 1998 Agreement; Mutual Delaware is not seeking to hold Spireas liable for breaches committed by Hygrosol. (Id. at 33-34.) Mutual Delaware further argues that even if its claim required piercing Hygrosol's corporate veil, there are genuine issues of material fact as to whether Spireas used Hygrosol to perpetuate a fraud in connection with the 1998 Agreement such that piercing the corporate veil might be warranted. (Id. at 34-35.)

In this section, the Court will first address how Spireas received royalty payments on felodipine and propafenone under the 1998 Agreement. Next, the Court will address whether the manner in which Spireas received payments under the 1998 Agreement is relevant to Mutual

Delaware's claim for money had and received. Lastly, the Court will address Mutual Delaware's claim for breach of contract and whether piercing Hygrosol's corporate veil is necessary and/or warranted.

### 1. Hygrosol Received Royalty Payments Under The 1998 Agreement And Then Distributed The Royalty Payments To Spireas And Bolton

As mentioned above, Spireas contends that there is no evidence to prove that he received royalty payments for felodipine and propafenone under the 1998 Agreement because the Agreement explicitly provides that any payments be made to Hygrosol and Hygrosol only. (Doc. No. 60 at 15-19.) Even though the 1998 Agreement specified that royalty payments be remitted to Hygrosol, the evidence of record purports to show that Spireas received royalty payments for felodipine and propafenone, albeit from Hygrosol as opposed to receiving them directly from Mutual PA and United.

In exchange for Spireas and Bolton granting Mutual PA and United the exclusive right to use their liquisolid technology, the 1998 Agreement set forth the following compensation structure:

> 2.4 Mutual and United shall have the exclusive right to Produce and Sell each Product developed hereunder for the life of the Product as long as Mutual and United pay to Hygrosol the compensation set forth in Section 4 below.
>
> ***
>
> 4.1 If Mutual or United submits a new Drug Application (NDA) or an Abbreviated New Drug Application (ANDA) for a Product developed hereunder and manufactures and sells this Product, then twenty percent (20%) of the gross profit will be paid to Hygrosol quarterly. . . .

(App. 2-3.)

Under the terms of the 1998 Agreement, Mutual PA and, as held above for summary judgment purposes, United, remitted royalty payments to Hygrosol based on their sales of felodipine and propafenone beginning in 2002. (Conf. App. 333, 340, 349, 353, 358, 363, 368, 373, 378, 383, 389, 393, 398, 403, 408, 413, 418, 423, 429, 434, 439, 444, 449, 454, 459, 464,

469, 474, 479, 484.)  Once the money was paid to Hygrosol, Spireas testified that Hygrosol would immediately and automatically distribute the funds to Spireas and Bolton.  In this regard, Spireas testified at his deposition that:

> Q:    Now, once the money was received by Hygrosol, how and when were they distributed to you, Dr. Bolton and anyone else, can you explain how that worked?
>
> A:    It was almost – until we got our bearings, it was almost an automatic process. The money was split within the same day or perhaps the next day it was transferred to me and Dr. Bolton from the Hygrosol account.  It was like automatically.

(App. 1150 at 104:15-24.)  Spireas also explained at his deposition that he and Bolton had an agreement to distribute the royalty payments amongst themselves:

> Q:    Was [the royalty payment] split 50/50 percent-wise?
>
> A:    We had an agreement that I was getting 55 percent of Hygrosol – I'm sorry – of Felodipine, and he was getting 45 percent, Dr. Bolton.  For Propafenone it was 50/50 down the middle.

(Id. at 104:25-105:5.)

Moreover, because Hygrosol was organized as an S-Corporation for tax purposes, Spireas testified that Hygrosol "was not declaring the money as its own income."  (App. 1151 at 106:20-24.)  Rather, Spireas and Bolton were "declaring the money personally" on their own tax returns. (Id.)  In fact, Spireas' tax characterization of the royalty payments he received from the 1998 Agreement led to him being the subject of a tax court proceeding in 2013.  See Spireas v. Comm'r of Internal Revenue, 112 T.C. (CCH) 262 (T.C. 2016), 2016 WL 4464695, aff'd, 886 F.3d 315 (3d Cir. 2018).

Based on the evidence of record, it is undisputed that Hygrosol first received the royalty payments for felodipine and propafenone under the 1998 Agreement, but the evidence creates a

genuine issue of material fact as to whether Spireas received royalty payments from Hygrosol pursuant to that Agreement.

>    2.    **Whether The Royalty Payment Passed Through Hygrosol Before Reaching Spireas Has No Effect On Mutual Delaware's Claim For Money Had And Received**

Mutual Delaware argues that whether the royalty payments for felodipine and propafenone passed through Hygrosol before reaching Spireas has no impact on its claim for money had and received because the claim requires only that Spireas received the payments, and does not hinge on how those payments came into his possession. (Doc. No. 64 at 30-31.) The Court agrees.

The Pennsylvania Superior Court explains the doctrine of money had and received as follows:

> Where one has in his hands money which in equity and good conscience belongs and ought to be paid to another, an action for money had and received will lie for the recovery thereof. No privity of contract is necessary to sustain this action, for the law, under these circumstances, implies a promise to pay. And it makes no difference that it is from someone other than the plaintiff that the defendant received the money.

Hughey v. Robert Beech Assocs., 378 A.2d 425, 427 (Pa. Super. Ct. 1977); see also Solomon v. Gibson, 615 A.2d 367, 369 (Pa. Super. Ct. 1992) (a claim for money had and received "entitles a party to relief where money is wrongfully diverted from its proper use and that money subsequently falls into the hands of a third person who has not given valuable consideration for it"). Accordingly, a plaintiff asserting a money had and received claim can recover money paid to a defendant because "'(1) the money had been paid by mistake or under compulsion, or (2) the consideration was insufficient.'" Springfield Twp. v. Mellon PSFS Bank, 889 A.2d 1184, 1186 n.2 (Pa. 2005) (quoting Action for Money Had and Received, Black's Law Dictionary 29 (10th ed. 2014)).

In this case, the evidence creates a genuine issue of material fact as to whether Spireas received royalty payments under the 1998 Agreement for felodipine and propafenone, albeit from Hygrosol. But because it makes no difference for a claim of money had and received that the money at issue is "from someone other than the plaintiff," it is of no consequence to Mutual Delaware's claim if Spireas received royalty payments from Hygrosol, or from Mutual PA and United directly. For this reason, the Court agrees with Mutual Delaware that its money had and received claim "is independent of the issue as to whether the royalty payments under the License Agreement were paid directly to Spireas from URL or Mutual Delaware."

3.  **On Its Claim for Breach of Contract, Mutual Delaware Is Entitled To Seek Royalty Payments Made By United To Hygrosol Under The 1998 Agreement**

In addition to its claim for money had and received, Mutual Delaware, as United's successor, asserts a claim against Spireas for breach of contract. Mutual Delaware's breach of contract claim is premised on its allegations that Spireas breached the personal obligations he owed to United under the 1998 Agreement, namely the obligation to personally oversee and supervise the development of felodipine and propafenone. (Id.; Doc. No. 64 at 32.) Mutual Delaware claims that Spireas breached this obligation by misrepresenting to Mutual PA and United the formulations for felodipine and propafenone as having been made by using his and Bolton's patented liquisolid technology when, in reality, the drugs were formulated without the patented technology. (Doc. No. 35 ¶¶ 89-91.) Mutual Delaware claims that as a result of this alleged breach, it has been damaged "in an amount to be determined at trial, including at least all of the royalties that [United] paid under the Liquisolid Agreement." (Id. ¶ 92.)

Spireas argues that Mutual Delaware, even as United's successor, cannot recover on the breach of contract claim the royalty payments he might have received under the 1998 Agreement because, as discussed above, he would have received those payments from Hygrosol and not from

Mutual PA and/or United directly. (Doc. No. 60 at 16-19, 21-22.) Spireas contends that the only way Mutual Delaware could recover the royalty payments he received from Hygrosol would be by piercing Hygrosol's corporate veil. And while piercing the corporate veil is allowed under narrow circumstances, Spireas argues that no circumstance is present here that would warrant such piercing. (Id. at 21-22.)

The Court disagrees that piercing Hygrosol's corporate veil is required in order for Mutual Delaware to recover the royalty payments that Spireas allegedly received in connection with the 1998 Agreement. The doctrine of piercing the corporate veil arises when a party seeks to hold an officer or shareholder of a corporation liable for the contractual obligations of the corporation. See Fort Washington Resources, Inc. v. Tannen, 846 F. Supp. 354, 361 (E.D. Pa. 1994) ("In the absence of a claim that the corporate veil should be pierced, a corporate officer cannot be held individually liable for breaches of contract by the corporation"). As such, piercing the corporate veil is relevant to a breach of contract claim when only the corporation is bound by the contract. KDH Electronic Sys., Inc. v. Curtis Tech. Ltd., 826 F. Supp. 2d 782, 794 (E.D. Pa. 2011) ("as a general matter, when a corporation enters into a contract, the corporation alone is liable").

In this case, piercing the corporate veil is not required to permit recovery on Mutual Delaware's breach of contract claim because the claim is premised on Spireas' own conduct in relation to the personal obligations he owed Mutual PA and United under the 1998 Agreement. Importantly, the 1998 Agreement imposed an obligation on Spireas to develop and formulate drug products using his and Bolton's liquisolid technology. Spireas agreed to be bound by this obligation because he signed the 1998 Agreement in his individual capacity. (App. 16.)

Here, Mutual Delaware is alleging that Spireas breached his personal obligation to develop felodipine and propafenone using the liquisolid technology. Mutual Delaware's breach of contract

claim focuses on Spireas' conduct and Spireas' obligations, it does not rely on Hygrosol's conduct or in any way seek to hold Spireas liable for the acts of Hygrosol. Consequently, piercing the corporate veil of Hygrosol is not a prerequisite to Mutual Delaware maintaining its claim against Spireas for breach of contract.

Moreover, because Mutual Delaware is alleging that Spireas' breach of the 1998 Agreement resulted in United (and Mutual PA) paying unnecessary royalties to Hygrosol, it follows that Mutual Delaware is entitled to seek recovery of the royalty payments as an element of its damages. Under Pennsylvania law, a plaintiff must establish the following three elements to maintain a claim for breach of contract: "(1) the existence of a contract, including its essential terms; (2) the defendant's breach of duty imposed by the terms; and (3) actual loss or injury as a direct result of the breach." Angino v. Wells Fargo Bank, N.A., 666 F. App'x 204, 207 (3d Cir. 2016) (citing Ware v. Rodale Press, Inc., 322 F.3d 218 225 (3d Cir. 2003)). With respect to the third element – actual loss or damages – the Pennsylvania Supreme Court explains as follows:

> "Where one party to a contract without any legal justification, breaches the contract, the other party is entitled to recover, unless the contract provided otherwise, whatever damages he suffered, provided (1) they were such as would naturally and ordinarily result from the breach, or (2) they were reasonably foreseeable and within the contemplation of the parties at the time they made the contract, and (3) they can be proved with reasonable certainty."

Lodato v. Silvestro, No. 12-1130, 2013 WL 172203, at *4-5 (E.D. Pa. Jan. 15, 2013) (quoting Ferrer v. Trs. of the Univ. of Pa., 825 A.2d 591, 610 (Pa. 2010)).

In this case, Mutual Delaware is alleging that but for Spireas representing to United that the formulations of felodipine and propafenone utilized his patented liquisolid technology, United never would have remitted royalty payments to Hygrosol under the 1998 Agreement. The royalty payments, regardless of whether they were first remitted to Hygrosol, are therefore damages that United suffered – damages which would "naturally and ordinarily result from the breach." Thus,

if Mutual Delaware successfully proves its breach of contract claim at trial, it is entitled to recoup the royalty payments made by United under the 1998 Agreement.

But even if piercing the corporate veil were necessary to reach the royalty payments on Mutual Delaware's breach of contract claim, the Court is satisfied that the evidence of record shows genuine disputes of material fact precluding summary judgment on the issue of whether piercing the corporate veil of Hygrosol is warranted. Under Pennsylvania law, there is a presumption against piercing a corporation's veil, or, in other words, a presumption against disregarding the corporate form. Accurso v. Infra-Red Servs., Inc., 23 F. Supp. 3d 494, 509 (E.D. Pa. 2014).

> [i]t is true that a corporation . . . is normally regarded as a legal entity separate and distinct from its shareholders . . . [t]his legal fiction of a separate corporate entity . . . will be disregarded whenever justice or public policy demand and when the rights of innocent parties are not prejudiced nor the theory of the corporate entity rendered useless. . . . [W]henever one in control of a corporation uses that control, or uses the corporate assets, to further his or her own personal interests, the fiction of the separate corporate identity may properly be disregarded.

Id. at 508-09 (quoting Ashley v. Ashley, 393 A.2d 637, 641 (Pa. 1978)).

Consequently, the standard "a party must meet to persuade a court to pierce the corporate veil is a stringent one." Id. "No clear test exists for determining when the piercing of the corporate veil is appropriate." Reivia Ashley, LLC v. Paselo Logistics, LLC, No. 14-5092, 2017 WL 6001640, at *13-14 (E.D. Pa. Dec. 1, 2017). In general, courts consider several factors, including, "undercapitalization, failure to adhere to corporate formalities, the insolvency of the entity, substantial intermingling of corporate and personal affairs, use of the corporate form to perpetrate a fraud, and circumstances that present an element of injustice or unfairness." Id.

Mutual Delaware argues that there is evidence of record to prove that Hygrosol's corporate veil should be pierced based on an alter ego theory. (Doc. No. 64 at 37.) Under the alter ego

theory of piercing the corporate veil, the party must establish that "the controlling corporation wholly ignored the separate status of the controlled corporation and so dominated and controlled its affairs that its separate existence was a mere sham." E. Minerals & Chemicals Co. v. Mahan, 225 F.3d 330, 333 n.6 (3d Cir. 2000). Said another way, the party seeking to pierce the corporate veil must show that the corporation "acted robot- or puppet-like in mechanical response to the controller's tugs on its strings or pressure on its buttons." Id.

In this case, there are material disputes of fact as to whether Hygrosol "followed corporate formalities such that Spireas could hide behind its corporate form." (Doc. No. 64 at 35.) In support of its argument that Hygrosol was Spireas' alter ego, Mutual Delaware has produced evidence showing that: (1) Spireas and Bolton were Hygrosol's only shareholders and officers; (2) Hygrosol never had any employees; and (3) Hygrosol was a "virtual company" that did not keep documents other than corporation-type documents. (Id. at 35-37.)

Mutual Delaware's evidence creates a genuine dispute of material fact as to whether Hygrosol behaved in such a "puppet-like" fashion, responsive to Spireas' "tugs on its strings," that piercing the corporate veil is warranted. Accordingly, even if Mutual Delaware needed to pierce Hygrosol's corporate veil to recover the royalty payments made under the 1998 Agreement, that fact alone would not entitle Spireas to summary judgment on Mutual Delaware's breach of contract claim.

### E. The October 2018 Settlement Agreement Between Takeda, Spireas, And Hygrosol Does Not Preclude Mutual Delaware's Claims

Spireas contends that he is entitled to summary judgment on Mutual Delaware's claims because Mutual PA, the "actual payor" under the 1998 Agreement, "released and forever discharged Dr. Spireas and Hygrosol for any and all claims relating to the license fee payments" by virtue of their October 2018 settlement agreement with Takeda. (Doc. No. 60 at 22.) Mutual

Delaware argues that the settlement agreement has no bearing on its claims in this case because the agreement pertains only to Mutual PA's license fee payments under the 1998 Agreement and, in this case, Mutual Delaware is asserting claims based on license fee payments made by United. (Doc. No. 64 at 38-39.)  The Court agrees with Mutual Delaware.

As mentioned previously, in October of 2018, Spireas, Bolton's Estate,[15] and Hygrosol executed a settlement agreement with the "Takeda Parties,"[16] including Mutual PA, and Roberts,[17] which resolved Takeda's claims in this case.  (Conf. App. 138-60.)  The specific release language in the settlement agreement provided as follows:

> Upon the Hygrosol Effective Date, the Takeda Parties and Roberts, on behalf of themselves, and (i) in the case of the Takeda Parties, their current or former subsidiaries, predecessors, successors, and assigns, as well as, for any of the foregoing, their current or former directors, officers, employees, and executors, and (ii) in the case of Roberts, on behalf of himself, his successors, assigns, attorneys, agents, spouse, heirs, and executors, hereby release, acquit, and forever discharge the Hygrosol Parties, including Hygrosol's directors, officers, employees, shareholders, attorneys, agents, predecessors, related entities, affiliates, successors, and assigns, other than the Estate, and as to Spireas his spouse, heirs, successors, assigns, executors, administrators, attorneys and agents, from any and all claim, counterclaims, cross-claims, defenses, issues, suits, liabilities, damages, costs, losses, interest, expenses, penalties, or causes of action, whether known or unknown, and of whatever kind or nature (whether common law, statutory, regulatory or administrative, and whether reduced to judgment, liquidated, fixed, contingent, matured, disputed, legal, equitable, or secured), that arose on or before the Hygrosol Effective Date.

(Id. at 141-42.)

---

[15]  Bolton had passed away by the time of the Settlement Agreement.

[16]  In addition to Mutual PA, the "Takeda Parties" are defined in the Settlement Agreement to include Pharmaceutical Holdings Corp. and Pharmaceutical IP Holdings, Inc., two Delaware companies that had been merged into Takeda.

[17]  As noted earlier, Richard Roberts, M.D., Ph.D. was the President and Chief Executive Officer of Mutual PA and United.

On October 26, 2018, in accordance with the settlement agreement, Takeda filed a Stipulation of Dismissal with Prejudice under Federal Rule of Civil Procedure 41. (Doc. No. 45.) In the Stipulation, Takeda agreed to withdraw with prejudice "all claims made by it against Defendant Spiridon Spireas in this action." (Id.) The Stipulation explicitly stated that "[n]othing herein shall affect the claims of Plaintiff Mutual Pharmaceutical Company, Inc." (Id.) On October 29, 2018, the Court signed the Stipulation thereby releasing Takeda as a Plaintiff in this case. (Doc. No. 46.)

Based on the language in the settlement agreement and the Stipulation filed by Takeda, the Court is satisfied that the settlement agreement does not preclude Mutual Delaware's claims in this case. The plain language of the settlement agreement releases only the claims against Spireas by the "Takeda Parties" and Roberts. The language of the Stipulation confirms that the settlement agreement applies only to Takeda's claims because it explicitly reserves Mutual Delaware's right to pursue its claims against Spireas. Accordingly, the settlement agreement has no impact on Mutual Delaware's ability to maintain its claims against Spireas in this case.[18]

---

[18] Even though the language of the settlement agreement is clear that it applies only to Takeda's claims, Spireas also makes the argument that the settlement agreement precludes Mutual Delaware's claims based on his position that United did not make royalty payments under the 1998 Agreement. The logic of Spireas' argument is that because the settlement agreement released all claims relating to royalties paid by Mutual PA, and because Mutual PA was the only party to make royalty payments under the 1998 Agreement, the settlement agreement released any and all claims relating to royalty payments under the 1998 Agreement. (Doc. No. 64 at 22, 38.) Because the Court has already determined that there are genuine issues of material fact as to whether United made royalty payments to Hygrosol under the 1998 Agreement, it cannot be said that as a matter of law, the settlement agreement with Takeda bars Mutual Delaware's claims in this case. For this additional reason, the Court finds Spireas' argument on the preclusive effect of the settlement agreement unavailing.

**F. Genuine Disputes Of Material Fact Exist As To Whether Mutual Delaware And United Made Royalty Payments Under The 1998 Agreement Voluntarily As A Result Of An Unprovoked Mistake Of Law**

Spireas also argues that he is entitled to summary judgment on Mutual Delaware's claims based on the voluntary payment doctrine. (Doc. No. 60 at 23.) Under this doctrine, Spireas contends that "[e]ven assuming <u>arguendo</u> [Mutual Delaware] paid Hygrosol, which it did not, or that the license fee payments were not owed, which they were, [Mutual Delaware] cannot recover from Dr. Spireas payments voluntarily made to Hygrosol based on [Mutual PA's] or its own mistake of law." (<u>Id.</u>) This argument is unavailing.

"The voluntary payment doctrine is a form of estoppel." <u>Williams v. Enterprise Holdings, Inc.</u>, No. 12-5531, 2013 WL 1158508, at *2 (E.D. Pa. Mar. 20, 2013). Under the voluntary payment doctrine, "'one who has voluntarily paid money with full knowledge, or means of knowledge of all the facts, without any fraud having been practiced upon him . . . cannot recover it back by reason of the payment having been made under a mistake or error as to the applicable rules of law.'" <u>Parsons v. City of Philadelphia</u>, No., 2014 WL 6973024, at *2 (E.D. Pa. Dec. 9, 2014) (quoting <u>Liss & Marion, P.C. v. Recordex Acquisition Corp.</u>, 983 A.2d 652, 661 (Pa. 2009)). As such, "'money paid voluntarily, although under a mistake of law as to the interpretation of a contract, cannot be recovered.'" <u>Williams</u>, 2013 WL 1158508, at *2 (quoting <u>Acme Markets, Inc. v. Valley View Shopping Ctr., Inc.</u>, 493 A.2d 736, 737 (Pa. Super. Ct. 1985)). Conversely, the voluntary payment doctrine does not apply and a party can recover payments where the payments were made "without full knowledge of the facts, or because of the other party's fraud, or under some type of duress . . . ." <u>Williams</u>, 2013 WL 1158508, at *2.

Spireas contends that even assuming Mutual Delaware and United made payments under the 1998 Agreement, the payments were made voluntarily and therefore cannot be recovered. (Doc. No. 60 at 23.) To prove that the payments were voluntary, Spireas relies on the fact that

Mutual Delaware "had at hand all information required to reach its conclusion" that it and, before it, United, owed payments to Hygrosol. According to Spireas, the information "had at hand" included "the 1998 Agreement, the March 2000 product license, the formulas for felodipine and access to the published patents making up the Hygrosol technology." (Id. at 23-24.)

Central to Mutual Delaware's claims in this case, however, is the allegation that Spireas fraudulently misrepresented the formulations of felodipine and propafenone to Mutual PA and United. To support its allegations of Spireas' misconduct, Mutual Delaware relies on statements put in the product development reports for felodipine and propafenone; reports that Spireas played an integral role in preparing. (Id. at 39-41.) As described previously, Mutual PA and United created product development reports for its propafenone and felodipine drug products in conjunction with their submission of Abbreviated New Drug Applications ("ANDAs") to the FDA. In those reports, the formulations for both drugs are described to some extent as being made with Spireas' patented liquisolid technology. (App. 987-1052.) At Spireas' deposition in this case, he admitted that he helped prepare the product development reports and that he was personally responsible for overseeing the formulation of the drug products. (App. 1128, 1146.)

Based on this evidence, there are genuine issues of material fact as to whether Spireas misrepresented the formulations for felodipine and propafenone to Mutual PA and United such that his conduct in connection with the 1998 Agreement could be considered fraudulent. Since the voluntary payment doctrine applies only in the absence of fraud, or where the payor has full knowledge of all the facts, it is therefore premature to apply the doctrine at this stage of the proceedings. Thus, summary judgment will be denied on this claim.

### G. Spireas Is Not Entitled To Summary Judgment Based On Claim Preclusion

Spireas' final argument in his first Motion for Summary Judgment is that the doctrine of res judicata, or claim preclusion, bars Mutual Delaware's claims in this case because they are

duplicative with the claims asserted by United in the state court proceedings. (Doc. No. 60 at 25-28.) Because the Court already has addressed this argument at the motion to dismiss stage (albeit when Takeda was the only Plaintiff) and found that claim preclusion did not apply to the federal court claims, Spireas' argument in this regard is unconvincing.

As already explained by the Court in its Opinion on the Motion to Dismiss:

"Claim preclusion, or res judicata, is a defense asserted when a case is essentially identical to one that has previously been adjudicated." R&J Holding Co. v. Redevelopment Auth. of Cty. of Montgomery, 670 F.3d 420, 427 (3d Cir. 2011). Its central purpose is "to require a plaintiff to present all claims arising out of the same occurrence in a single suit." Blunt v. Lower Merion Sch. Dist., 767 F.3d 247, 277 (3d Cir. 2014) (internal quotation marks and brackets omitted). In doing so, courts "relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication." Marmon Coal Co. v. Dir., Office of Workers' Comp. Programs, 726 F.3d 387, 394 (3d Cir. 2013) (internal quotation marks omitted). "To those ends, the doctrine of [claim preclusion or] res judicata bars not only claims that were brought in a previous action, but also claims that could have been brought." Davis v. Wells Fargo, 824 F.3d 333, 342 (3d Cir. 2016) (internal quotation marks omitted).

Federal courts apply the claim preclusion law of the state in which the judgment was entered, and thus Pennsylvania claim preclusion law applies. Turner v. Crawford Square Apartments III, L.P., 449 F.3d 542, 548 (3d Cir. 2006) (citing Lance v. Dennis, 546 U.S. 459 (2006)). Pennsylvania's law of claim preclusion was summarized by the Pennsylvania Supreme Court in Balent v. City of Wilkes-Barre:

> Any final, valid judgment on the merits by a court of competent jurisdiction precludes any future suit between the parties or their privies on the same cause of action. [Claim preclusion or] [r]es judicata applies not only to claims actually litigated, but also to claims which could have been litigated during the first proceeding if they were part of the same cause of action.

669 A.2d 309, 313 (Pa. 1995) (citations omitted). For claim preclusion to apply, Pennsylvania law requires that the two actions share the following four conditions: "(1) the thing sued upon or for; (2) the cause of action; (3) the persons and parties to the action; and (4) the capacity of the parties to sue or be sued." R&J Holding Co., 670 F.3d at 427 (citing Bearoff v. Bearoff Bros., Inc., 327 A.2d 72, 74 (Pa. 1974)).

(Doc. No. 33 at 14-15.)

Based on the above, this Court determined that claim preclusion did not apply because even though the present action and the state court action shared "the thing sued upon for" and involved the same parties, they did not share the same causes of action. (Id. at 15-19.) The state court case arose after Mutual PA and United learned that St. John's University, where Spireas and Bolton first met, had filed a federal lawsuit against Spireas, Bolton, and Hygrosol, asserting ownership rights to Spireas' and Bolton's liquisolid patents. Consequently, Mutual PA and United sued Spireas, Bolton, and Hygrosol in state court, alleging that Spireas and Bolton had misrepresented their sole ownership rights to the liquisolid patents in the 1998 Agreement. (Id. at 16-17.) In this case, Takeda sued Spireas based on the allegation that Spireas had misrepresented to Mutual PA that his liquisolid patents were used to formulate felodipine and propafenone under the 1998 Agreement. (Id.) Because Takeda's allegations had nothing to do with Spireas' patent ownership, the Court held that the causes of action in this case were not the same as the causes of action in the state court case and, thus, claim preclusion did not apply. (Id. at 17.)

Without acknowledging the Court's prior claim preclusion analysis, Spireas argues for a second time that "the causes of action in [the state court case] United v. Spireas and this litigation are the exact same." (Doc. No. 60 at 27.) The Court will not disturb its prior determination that claim preclusion does not bar Mutual Delaware's claims in this case. As such, Spireas is not entitled to summary judgment based on the doctrine of claim preclusion.

In sum, as to Spireas' first Motion for Summary Judgment, there are at least genuine disputes of material fact with respect to whether (1) United made payments under the 1998 Agreement; (2) Mutual Delaware made payments under the 1998 Agreement; (3) Spireas received payments under the 1998 Agreement; and (4) payments made by United and/or Mutual Delaware under the 1998 Agreement were voluntary. These factual disputes prevent the Court from entering

judgment as a matter of law in favor of Spireas and, consequently, Spireas' first Motion for Summary Judgment must be denied.

### H. Genuine Disputes Of Material Fact Preclude Judgment As A Matter Of Law On Spireas' "Companion" Motion For Summary Judgment On Mutual Delaware's Claim For Money Had And Received Based On False Pretenses

As noted above, in addition to filing the first Motion for Summary Judgment on Mutual Delaware's claims (Doc. No. 60), Spireas also filed a second "companion" Motion for Summary Judgment specifically challenging Mutual Delaware's claim in Count II of the Amended Complaint for money had and received based on alleged false pretenses (Doc. No. 61). In Count II of the Amended Complaint, Mutual Delaware alleges the following on the claim for money had and received:

> 94. Plaintiffs paid royalties on sales of generic felodipine and propafenone to Spireas via Hygrosol, based on the erroneous belief that the formulations that formed the basis of Mutual's ANDAs used the 'Patent' and were 'Products' under the Liquisolid Agreement.

> 95. In reality, the formulations that formed the basis of Mutual's ANDAs for felodipine and propafenone were Confidential Information belonging to Mutual, free of any royalty obligation under the Liquisolid Agreement.

> 96. It would be inequitable, unjust, and unconscionable to allow Spireas to retain the royalty payments which have provided a windfall to Spireas at Plaintiffs' expense and to Plaintiffs' detriment, without payment for value.

(Doc. No. 35 ¶¶ 94-96.)

In his second Motion, Spireas contends generally that these allegations require Mutual Delaware to prove that Spireas is liable for fraud in order to succeed on its money had and received claim.[19] (Doc. No. 60 at 10.) Spireas argues that Mutual Delaware has failed to produce evidence

---

[19] Under Pennsylvania law, the elements of common law fraud are: "(1) a representation; (2) material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) a resulting injury proximately caused by the reliance. Am. Diabetes Assoc. v. Friskney Family Tr., LLC, 177 F. Supp. 3d 855, 880-81

showing his conduct rose to the level of fraud and, as such, he is entitled to summary judgment on the claim. Spireas specifically contends that Mutual Delaware has failed to produce evidence showing that (1) he made material misrepresentations to Mutual PA and/or United in connection with the 1998 Agreement, or (2) Mutual PA and, as alleged by Mutual Delaware, United, made payments under the 1998 Agreement based on anything other than full knowledge of Spireas' formulations of propafenone and felodipine. (Doc. No. 61 at 7-18.) The Court will address these arguments in turn below.

### 1. Mutual Delaware Is Not Required To Prove Fraud In Order To Maintain Its Claim For Money Had And Received

As stated previously, a claim for money had and received is a common-law claim that allows a plaintiff to recover money paid to a defendant if "(1) the money had been paid by mistake or under compulsion, or (2) the consideration was insufficient." Springfield Twp. v. Mellon PSFS Bank, 889 A.2d 1184, 1186 n.2 (Pa. 2005) (citing Action for Money Had and Received, Black's Law Dictionary 29 (10th ed. 2014)). Accordingly, the claim arises "'where one has . . . money which in equity and good conscience belongs and ought to be paid to another . . . .'" Smith v. Industrial Valley Title Ins. Co., Nos. 90-2132, 90-2175, 90-2971, 90-3856, 1990 WL 112077, at *2 (E.D. Pa. Aug. 2, 1990) (quoting First Nat'l Bank v. Carroll Township, 27 A.2d 527, 530 (Pa. Super. Ct. 1942)). As such, a plaintiff must prove that the defendant in receipt of the money engaged in some type of wrongful or illegal conduct. Id. Although a plaintiff must show that the defendant in receipt of the "money had" engaged in wrongful conduct, the plaintiff need not prove that the wrongful conduct rose to the level of fraud.

---

(E.D. Pa. 2016) (citing Ira G. Steffy & Son, Inc. v. Citizens Bank of Pa., 7 A.3d 278, 290 (Pa. Super. Ct. 2010)).

Thus, while Mutual Delaware's claim for money had and received rests on allegations that Spireas engaged in wrongful, potentially fraudulent, conduct, the success of the claim does not hinge on Mutual Delaware proving the elements of fraud as Spireas suggests. Even so and for the sake of completeness, the Court will address below Spireas' arguments regarding Mutual Delaware's evidence, or lack thereof, showing fraud.

### 2. Genuine Disputes Of Material Fact Have Been Shown As To Whether Spireas Made Material Misrepresentations to Mutual PA And/Or United In Connection With The 1998 Agreement

Spireas contends that Mutual Delaware cannot identify a material misrepresentation made by him in connection with the 1998 Agreement on which Mutual PA and or United relied. (Doc. No. 61 at 10.) Spireas argues that Mutual Delaware's allegation that he misrepresented the formulations of felodipine and propafenone is not only false but also impossible since, at the time that the drugs were being developed, the patents "covering the formulation process relevant to the two drugs had neither been issued or been included in any application." (Id. at 10-11.) The Court is not persuaded by Spireas' argument in this regard.

Spireas ultimately received four patents covering his liquisolid technology. The first two patents – the 834 and 500 Patents – were based on applications submitted by Spireas and Bolton prior to the execution of the 1998 Agreement. Although the 834 Patent was first to be issued to Spireas and Bolton in September of 1998, the 550 Patent was a "division" of the 834 Patent and was issued just over a year later, in October 1999. (App. 54, 58.) The third and fourth patents – the 337 and 339 Patents – were based on applications submitted after execution of the 1998 Agreement. The 337 Patent was issued in August 2000, and the 339 Patent was issued in July 2002. Even so, the patents were related to the 834 and 550 Patents. The 337 Patent stated that it was a "continuation" of the 834 and 550 Patents, and the 339 Patent stated that it was a "continuation" of the 834, 550, and 337 Patents. (App. 62, 66.)

Spireas argues that he could not have misrepresented the formulas for felodipine and propafenone because the patents "covering the formulation process relevant to the two drugs" were the 337 and 339 Patents, which had not yet been applied for or issued at the time when the drugs were being developed. But because the 337 and 339 Patents were continuations of the 550 and 834 Patents, which had been issued by the time Spireas formulated felodipine and propafenone, the Court is not convinced that the application and issuance dates of the 337 and 339 Patents necessarily matter to whether Spireas misrepresented the formulations of the drugs.

Even beyond the dates of the patent applications, however, Mutual Delaware has produced evidence that sufficiently creates genuine issues of material fact regarding whether Spireas misrepresented the formulations of felodipine and propafenone. The first piece of evidence is the 1998 Agreement. In the 1998 Agreement, Spireas, Hygrosol, and Bolton agreed to grant Mutual PA and United the exclusive right to use their "Technology" to develop generic drug products. (App. 1.) "Technology" was defined in the Agreement as "all of the technology which is subject of the Patent." (Id.) "Patent" was defined in the Agreement as Spireas and Bolton's claims in the application that eventually became the 834 Patent. (Id.) Based on the 1998 Agreement, Mutual PA and United formed the expectation that the technology in the 834 Patent would be used in any formulations of drugs Spireas developed pursuant to the Agreement.

Aside from the 1998 Agreement, Mutual Delaware submits that the product development reports for felodipine and propafenone support that Spireas misrepresented the formulations of the drugs. As noted previously, United and Mutual PA created internal product development reports to describe the development process for each of its felodipine and propafenone drug products. The reports were created with the assistance of Spireas, particularly with his consultation on the more technical aspects of the drug development process. (App. 1146.) The report for felodipine that

was submitted as part of the record states that the drugs were developed "based on novel methodology relevant to the patented technique of Liquisolid Systems." (App. 1025.) The propafenone report similarly states that the drugs "were developed based on a novel methodology relevant to the patented technique of Liquisolid Systems (Patent # US5,968,550 ['550 Patent'])." (App. 987.)

Based on the 1998 Agreement, the product development reports, and Spireas' alleged assurances as to the formulations of propafenone and felodipine, Mutual Delaware argues that Mutual PA and United made royalty payments under the 1998 Agreement on the justified expectation that Spireas' patented liquisolid technology was used in the formulations of the drug products. Although Spireas disagrees with Mutual Delaware's argument, it is evident that this issue presents a factual dispute that must be resolved by the fact finder at a trial. At this stage of the case, the Court cannot say that, as a matter of law, Spireas did not make any misrepresentations about the propafenone and felodipine formulas which would render him liable. For this additional reason, summary judgment will be denied.

### 3. Genuine Disputes Of Material Fact Have Been Shown As To Whether Mutual PA And/Or United Justifiably Relied On Spireas' Representations That They Were Selling Drugs That Contained The Patented Technology

Regardless of whether Spireas misrepresented the formulations of felodipine and propafenone, he contends that Mutual PA,[20] "a sophisticated drug company," did not rely on his statements when it made the decision to pay royalties under the 1998 Agreement. (Doc. No. 61 at

---

[20] Spireas argues that Mutual PA did not rely on his statements when it made the decision to pay royalties under the 1998 Agreement. Spireas ignores whether United relied on his statements because Spireas does not agree that United made any royalty payments under the 1998 Agreement. In any event, because the Court has already determined that there is a genuine issue of material fact as to whether United made payments under the 1998 Agreement, the Court will discuss in this section whether both Mutual PA and United were justified in relying on Spireas' representations.

11.) Rather, Spireas contends that Mutual PA paid royalties to Hygrosol under the 1998 Agreement because the company believed that they were obligated to pay after receiving a "long and expensive education on the formulation of propafenone and felodipine, which included knowing exactly how the liquisolid technology was used in the drugs' formulation." (Doc. No. 61 at 11-12.)

With respect to both propafenone and felodipine, Spireas contends that the time and effort Mutual PA invested to develop the drugs before March 2000, when it licensed the liquisolid technology from Hygrosol, proves that Mutual PA knew enough about propafenone and felodipine formulations that Spireas could not have "tricked" the company into making royalty payments. As to propafenone, Spireas contends that Mutual PA's dealings with Knoll Pharmaceutical Company, the maker of brand-name propafenone, Rhythmol, show that Mutual PA understood the liquisolid technology such that it cannot now "feign ignorance regarding the propafenone formulation." (Doc. No. 61 at 14.) As to felodipine, Spireas contends that the felodipine formulations Mutual PA developed before invoking the 1998 Agreement – formulations that used liquisolid technology but were abandoned for fear of infringing on AstraZeneca's Plendil patent – prove that Mutual PA knew how the drug was formulated. (Id. at 15.)

Although Spireas is correct that Mutual PA spent significant time and effort to develop propafenone and felodipine before working with him and his liquisolid technology, this fact does not conclusively prove at the summary judgment stage that Mutual PA was so informed about the formulations that it was unjustified in relying on Spireas' expertise and statements about the drugs. On the contrary, Mutual PA's "multi-year and multi-million dollar" unsuccessful efforts to develop propafenone and felodipine show why Mutual PA needed to rely on Spireas in the first place. Spireas, who was Mutual PA's Vice President of Research and Development and resident in-house

liquisolid technology expert, was the one to fix all of Mutual PA's formulation problems for felodipine and propafenone. With respect to the propafenone formulation, Spireas concedes that he was the reason behind Mutual PA's ultimate success in formulating the drug:

Question:     [Were prior Mutual PA's prior propafenone attempts] using a Liquisolid technology?

Answer:       They were not using Liquisolid.  They were using their own techniques, formulation techniques.  So it was impossible to pass Propafenone.  It was not only impossible for them, by the way.  It was imposible for everybody out there.  There was no generic Propafenone.  So along comes Spiro [Spireas].  They always expected for me to pass everything, boom, boom, boom.  Spiro will pass.  Anyway, I use Liquisolid technology on Propafenone, and I gave it this extra technique.  And instead of having 50 or 60 percent, we went to a hundred percent.

***

Question:     Did you, yourself, come up with a solution?

Answer:       Of course.  I came up with all the solutions.

(App. 1140.)  The fact that Spireas "came up with all the solutions" for felodipine and propafenone shows that even though Mutual PA was a sophisticated drug company, it did not know "exactly how the liquisolid technology was used in the drugs' formulation" otherwise it would have successfully formulated propafenone and felodipine on its own.   (Doc. No. 61 at 12.) Consequently, at this point in the litigation, the Court cannot conclude that as a matter of law Mutual PA and United's reliance on Spireas was unjustified.

In sum, as to Spireas' second Motion for Summary Judgment, putting aside the fact that Mutual Delaware is not required to prove the elements of fraud to maintain its claim for money had and received, there are nevertheless genuine issues of material fact regarding the alleged misrepresentations Spireas made to Mutual PA and United in connection with the formulations of felodipine and propafenone, as well as genuine issues of material fact as to whether United was

justified in relying on the statements when it and Mutual PA remitted royalty payments to Hygrosol under the 1998 Agreement. For these reasons, Spireas is not entitled to summary judgment on Mutual Delaware's money had and received claim and his second Motion for Summary Judgment also will be denied.

## V.     CONCLUSION

For the foregoing reasons, Spireas's Motion for Summary Judgment (Doc. No. 60) and Motion for Summary Judgment on Plaintiff's Money Had and Received Claim Based on Alleged False Pretenses (Doc. No. 61) will be denied.  An appropriate Order follows.